[Crim. No. 1068. Second Appellate District, Division Two.—January 13, 1925.]

## THE PEOPLE, Respondent, v. MICHAEL DEGNEN, Appellant.

[1] CRIMINAL LAW—PLEADING—MORE THAN ONE OFFENSE.—In determining the effect of an indictment consisting of two counts, one charging assault with intent to murder and the other rape, as against a demurrer on the ground that "more than one offense is attempted to be charged in the said indictment, except as provided in section 954 of the Penal Code . . . in this, . . . that the said indictment charges, or attempts to charge, two different offenses which do not appear from the said indictment to be connected together in their commission, and which do not appear

from the said indictment to be different statements of the same offense, and which appear from the said indictment not to be different offenses of the same class of crime," the appellate court may only look upon the face of the pleading, and may not predicate its determination upon the evidence in the cause.

[2] ID.— COINCIDENT OFFENSES.— An indictment in more than one count, based upon the clause in section 954 of the Penal Code allowing "two or more different offenses connected together in their commission," must show upon its face that the various crimes charged in its several counts were coincident or connected in their perpetration.

[3] ID.—ASSAULT TO MURDER—RAPE—JOINDER UNDER SECTION 954, PENAL CODE.—In this prosecution, the indictment charging in the first count that the defendant on a certain day, at a specified place, committed an assault with intent to murder upon the body of a certain person, and, in the second count, which was alleged to be a "further and separate cause of action, being a different offense of the same class of crimes and offenses as that set forth" in count one, that the defendant, on said day, at said place, committed rape upon the body of the same person, sufficiently notified the defendant that the two crimes, each involving an assault, were attempted to be committed by the same or similar means; and such offenses were properly joined under the provision of section 954 of the Penal Code, which permits a statement in separate counts of "two or more different offenses of the same class of crimes or offenses."

[4] ID.—SEVERAL OFFENSES — ONE TRIAL — ONCE IN JEOPARDY.—The rule that when a defendant has been acquitted or convicted of a particular offense and he is subsequently and in another trial attempted to be prosecuted for another offense against the same property right or against the same person, both offenses arising upon the same facts and one being or constituting a necessary element in the other, the second prosecution must fail, for the reason that the defendant has been once in jeopardy, has no application where the defendant is tried at one and the same time and upon the same evidence under both of the charges against him, and the verdict as to each offense is returned at the same time.

[5] ID. — SEPARATE READING OF VERDICTS — ONCE IN JEOPARDY. — Neither is such rule of once in jeopardy available to the defendant as to the second charge, that of attempt to commit rape, upon which he is convicted because of the fact that the verdict finding him guilty of the first charge, that of assault, was read by the clerk, after the two were handed to him by the foreman of the jury, before the reading of the verdict finding him guilty

---

3.  Joinder of two or more offenses in one indictment, note, 58 Am. Dec. 238. See, also, 14 R. C. L. 196; 14 Cal. Jur. 64.

of an attempt to commit rape, where he is tried at one and the same time and upon the same evidence under both of the charges against him, and the verdict as to each is returned at the same time.

[6] ID.—JOINDER OF SEVERAL CHARGES — PUNISHMENT UPON ONE CHARGE. — Although section 954 of the Penal Code allows the joinder in one indictment of two or more charges under different counts, where the defendant by his one act or through one transaction violates two or more sections of that code, it is possible that the accused is punishable upon but one of the charges, under the provisions of section 654 of that code; but by this it is not meant that, where a defendant is convicted upon two charges made under section 954 of that code, he is to be punished only for the commission of the lesser offense of which he is found guilty.

[7] ID.—RAPE—PRIOR UNCHASTE ACTS OF PROSECUTRIX—EVIDENCE.— In a prosecution for rape by force and violence, unchaste acts of the prosecutrix committed with the defendant or with other men than the defendant may be shown for the purpose of disproving the allegation that the act charged against the defendant was permitted through the exercise of force, and despite the unwillingness of the prosecutrix.

[8] ID.—ELEMENTS OF CRIME—BURDEN OF PROOF—REBUTTAL.—In such a prosecution, the burden is upon the prosecution to prove both the commission of the act and the lack of consent of the victim to its commission; and the defendant may offer proof to rebut the evidence introduced by the prosecution in support of each of the two branches of the case.

[9] ID.—RESISTANCE BY PROSECUTRIX—CREDIBILITY OF TESTIMONY—PRIOR CARNAL EMBRACE — CROSS-EXAMINATION.— On the cross-examination of the prosecuting witness in a rape case the defendant may put questions calculated to prove that she had, previous to the time set in the charge, willingly submitted herself to his carnal embrace, or, if not proving that fact, tending to affect the credibility of her story that the alleged criminal act was resisted by her, and, in fact, the credibility of her entire testimony.

[10] ID.—PRIOR ASSOCIATIONS WITH ACCUSED—EVIDENCE.—In a prosecution for rape, it is proper for the prosecution to show the character and extent of the prosecutrix's association with the accused prior to the time set in the charge for the purpose of demonstrating to the jury that the prosecutrix had a right to be alone with the accused on the occasion when the alleged crime was committed

6. See 14 Cal. Jur. 69.

7. On evidence of specific instances to prove character for chastity, notes, 14 L. R. A. (N. S.) 714; L. R. A. 1916B, 965. See, also, 22 R. C. L. 1209, 1210.

and to expect conduct from him of a character totally different from that with which he was charged.

[11] Id.—Cross-examination of Prosecutrix—Immoral Conduct—Erroneous Ruling.—In a prosecution for rape, it is error for the trial judge to rule that counsel for the accused, on cross-examination of the prosecutrix, can inquire as to the immoral conduct between the prosecutrix and the accused only by putting to the former direct questions as to whether the two had together committed sexual intercourse upon specified occasions and that he then must take her answers to such questions.

[12] Id.—Proof of Immoral Conduct—Scope of Cross-examination. In such a prosecution, the matter of the alleged or supposed immoral conduct of the prosecutrix with the accused is not one of impeachment, under rules compelling him to put only direct questions to her and forcing him later to prove what he contended was the actual fact by witnesses in his own behalf, but he has the right to prove her misconduct, if any there was, out of her own mouth, if he can, either directly or by circumstances from which the jury might justly infer that she had been guilty of misconduct; and for that purpose he has the right to embark upon a searching cross-examination, limited only by the broad lines of the direct examination.

[13] Id.—Credibility of Prosecutrix—Cross-examination.—In such a prosecution, aside from the alleged immoral conduct of the prosecutrix, the accused has the right vigorously to cross-examine her as to every material feature of her direct examination for the purpose of destroying, if he may, her credibility as a witness in general and as to every part of her testimony.

[14] Id.—Misconduct of Trial Court—Limited Cross-examination—Prejudicial Error. — In this prosecution under an indictment charging, in one count, assault with intent to murder and, in a second count, rape, the appellate court could not say whether the accused would or would not have been convicted but for the errors of the trial court in limiting the cross-examination of the prosecutrix and in making erroneous observations in connection with his rulings limiting such cross-examination; and, under such circumstances, section 4½ of article VI of the constitution was not available to uphold the verdict of conviction.

(1) 31 C. J., p. 778, n. 95, p. 818, n. 96.   (2) 31 C. J., p. 818, n. 97 New.   (3) 31 C. J., p. 783, n. 76.   (4) 16 C. J., p. 271, n. 9. (5) 16 C. J., p. 271, n. 9.   (6) 17 C. J., p. 203, n. 85.   (7) 33 Cyc., p. 1479, n. 74, p. 1480, n. 76.   (8) 33 Cyc., p. 1453, n. 15, 17, p. 1454, n. 27.   (9) 33 Cyc., p. 1457, n. 36.   (10) 33 Cyc., p. 1457, n. 36. (11) 33 Cyc., p. 1480, n. 76.   (12) 33 Cyc., p. 1480, n. 76; 40 Cyc., p. 2501, n. 94.   (13) 40 Cyc., p. 2564, n. 98, p. 2565, n. 7, p. 2570, n. 23.   (14) 17 C. J., p. 369, n. 6.

13.   See 22 Cal. Jur. 379.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. M. W. Conkling, Judge. Reversed.

The facts are stated in the opinion of the court.

LeCompte Davis, Wm. M. Bowen and MacDonald & Thompson for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

WORKS, J.—Defendant was tried under an indictment in two counts. The first count, shortened by the omission of mere formal statements, reads that defendant "is accused . . . of a felony, to-wit, assault with intent to murder, committed at and in the County of Los Angeles . . . as follows, to-wit: That, on or about the 30th day of July, 1923, . . . the said defendant did willfully, unlawfully and feloniously and with malice aforethought by means of a certain deadly weapon, to-wit, a certain cord capable of strangling and killing, and with his hands, feet and body, make an assault upon the person of" the complaining witness, "with intent then and there, willfully, unlawfully, feloniously and with malice aforethought, to kill and murder the said" complaining witness. The second count, similarly shortened, is to the effect that defendant, "for a further and separate cause of action, being a different offense of the same class of crimes and offenses as that set forth in Count I hereof, . . . is accused . . . of a felony, to-wit, rape, committed at and in" the same county " . . . as follows, to-wit: That on or about" the same date " . . . the said defendant did then and there, willfully, unlawfully and feloniously and with force and violence have and accomplish an act of sexual intercourse with and upon the" complaining witness, "without the consent and against the will of the" complaining witness, "and she, the" complaining witness, " . . . then and there resisted the accomplishment of such act of sexual intercourse." Under the first count of the indictment, defendant was convicted of an assault. Under the second count he was convicted of an attempt to commit rape. Defendant appeals from the judgment of conviction and from an order of the trial court denying his motion for a new trial.

Appellant contends that the trial court erred in overruling his demurrer to the indictment. One of the grounds of demurrer was that "more than one offense is attempted to be charged in the said indictment, except as provided in section 954 of the Penal Code . . . in this, . . . that the said indictment charges, or attempts to charge, two different offenses which do not appear from the said indictment to be connected together in their commission, and which do not appear from the said indictment to be different statements of the same offense, and which appear from the said indictment not to be different offenses of the same class of crimes." Section 954, so far as it is material to the points presented under the demurrer, reads: "The indictment or information may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses under separate counts. . . . "

[1] The integrity of the indictment is sought to be upheld under that portion of section 954 which allows the setting up in separate counts of "different statements of the same offense," but the effort is based upon the evidence in the cause, instead of upon the face of the pleading, to which alone we may look in determining its effect when tested by the demurrer. We search the indictment in vain for any language which indicates that the pleader attempted by it to state two versions of the same occurrence. Under the allegations of the pleading the events stated in the two counts may well have been far apart, both as to time and place. They may have occurred at opposite ends of the twenty-four hours constituting the day mentioned in each count and, by force of that fact, they may have transpired at opposite corners of the county named in each count. Some time after section 954 was first put into a shape similar to its present form an information was before the court in which it was alleged in a second count that the defendant committed the offense therein denounced "as a part of the same act, transaction or event alleged in the first count" (*People* v. *Piner,* 11 Cal. App. 542 [105 Pac. 780]), the pleader who framed the information thus apparently evincing a correct understanding of the import of the section. In truth, under an earlier form of the enactment which allowed a statement of the same offense "in different forms under different counts" the supreme court had posi-

tively decided that "this must be done in such a way as to show clearly upon the face of the indictment or information that the matters and things set forth in the different counts are descriptive of one and the same offense." (*People* v. *Garcia,* 58 Cal. 102). In another case, decided when section 954 stood somewhat as it does at present, an information was before the court in which it was alleged in a second count, as appears from parts of the record not referred to in the report, but which we have examined, that the offense in that count denounced was "a second, separate and different statement of the same act, transaction and event" mentioned in a first count. The court said: "Both counts in stating the offense with which defendant was charged related to and were predicated upon the same act and transaction, and, hence, the information was not subject to demurrer upon the ground" that it stated more than one offense (*People* v. *Danford,* 14 Cal. App. 442 [112 Pac. 474]), leaving it logically to be inferred that the pleading would have been demurrable had it not contained the quoted allegation. It was said in a later case that in "charging under this section [954] it is of course necessary that care be taken to make it clearly appear that the offense set forth relates to but one act, transaction or event" (*People* v. *Miles,* 19 Cal. App. 223 [125 Pac. 250]). Finally, it was said by the supreme court: "Where it is sought to charge in one indictment or information different offenses all relating to the same act, transaction or event, as is now permitted by section 954 of the Penal Code, we are of the opinion that, under our practice where one of the grounds of demurrer provided by law is that more than one offense is charged except as provided by section 954 (Pen. Code, sec. 1004, subd. 3), the pleading should fairly show on its face that the offenses so charged do all relate to the same act, transaction or event" (*People* v. *Plath,* 166 Cal. 227 [135 Pac. 954]). The transmutations in the form of section 954 have not been such as to render these cases now inapplicable in principle. We are satisfied that the indictment now before us cannot be upheld as showing in separate counts "different statements of the same offense."

[2] We are equally convinced of the failure of the indictment when tested by that part of section 954 which allows a statement of "two or more different offenses connected together in their commission." The cases cited in

the last preceding paragraph are surely authority for the
statement that an indictment based upon the clause just
quoted must show upon its face that the various crimes
charged in its several counts were coincident or connected
in their perpetration. In the present instance the possi-
bility of such a connection is left entirely to the imagination.

[3] We turn, then, to the clause of the section which
permits a statement in separate counts of "two or more
different offenses of the same class of crimes or offenses."
Notwithstanding the attempt of the attorney-general to sus-
tain the indictment under another clause of the statute, it
is evident that he who drafted the pleading intended it
to stand under the language of the section which has just
been quoted. He says in his pleading that the crime de-
nounced in the second count is "a different offense of the
same class of crimes and offenses as that set forth" in the
first count. Can the indictment be upheld upon the score
thus selected by the pleader? We think it can. True, it
may appear at first glance that assault with intent to mur-
der, and rape, cannot belong to the same class, whatever
scheme of classification the legislature may have had in
mind when the present section 954 was enacted. A closer
scrutiny, however, creates doubts as to the validity of this
appearance. The crime first mentioned is an assault, and
every rape not only originates in, but itself includes an as-
sault. Then, the supreme court, in *People* v. *Jailles,* 146
Cal. 301 [79 Pac. 965], when dealing with another phase of
section 954, has justified a close inspection of the indictment
before us in order, unrestricted by too close rules of inter-
pretation, to ascertain the intent and purpose of its drafts-
man as conveyed to appellant. In that case the pleader had
joined a count upon rape by force and violence with one
upon rape because of the nonage of the victim, both acts
being alleged to have been committed upon the same day
and upon the person of the same female. The court said:
"It must be conceded that it would be preferable for the
pleader endeavoring to set forth one offense in different
forms under different counts to expressly state in the in-
formation that the matters and things so set forth are de-
scriptive of one and the same offense. Such a statement
would obviate all questions as to the intention of the pleader.
We think, however, that, despite the absence of such a state-
ment in the information before us, it is manifest that it was

sought to charge but one offense—viz., one rape committed on Maria Tampo on May 10, 1903. The nature of the allegations in the two counts shows this very clearly. The only difference between the allegations of the two counts is, that force, violence, and resistance are alleged in one without allegation as to age, while in the other is the allegation as to age without any allegation as to force, violence, and resistance. The allegations of each show the offense of rape, committed on the same person on the same day, and indicate that the district attorney was simply endeavoring to set forth the same transaction in different ways. . . . '' This conclusion as to the effect of the information against Jailles, although it had to do primarily with the element of time, an element with which we are not here greatly concerned, inspires these views concerning the indictment now in question: It is alleged in the first count that the attempt to murder was essayed by means of a certain cord used for the purpose of causing death by strangulation. The second count opens with the allegation that the crime about to be charged therein was of the same class with the one charged in the first count, this significant language being followed by a charge of rape with force and violence. Taking the entire pleading together, why may it not be said that appellant was sufficiently notified by it that the two crimes, each involving an assault, as it did, were attempted to be committed by the same or similar means—a means specifically described in the first count but not described in the second—a means through which, in the one instance, appellant sought to deprive the complaining witness of her life, while in the other he actually deprived her of her virtue? We think it may. It appears to us, on the whole, that the indictment, when considered under the clause of section 954 now under consideration, was not obnoxious to the demurrer. As it alleged two offenses, both in the nature of assaults, as having been committed on the same day, in the same county, and upon the body of the same person, we think the section was satisfied. The only cases we have found which bear upon the portion of the section relating to offenses of the same class are *People* v. *Murnahan*, 32 Cal. App. 211 [162 Pac. 422], *People* v. *MacDonald*, 53 Cal. App. 488 [200 Pac. 491], and *People* v. *Mayen*, 188 Cal. 237 [24 A. L. R. 1383,

205 Pac. 435]. They have not been of material assistance, however, in determining the present question.

Appellant argues with great vigor that his conviction of the lesser charge of an assault under the first count was tantamount to an acquittal of the charge embraced in the second count, and, more especially, of the charge of which he was actually convicted under the second count. This point is made, of course, from the basis upon which respective counsel have argued the question arising upon the demurrer to the indictment. As that pleading cannot be upheld as containing different statements of the same offense, but only as an attempt to plead separately committed crimes of the same class, it is possible that we might justify ourselves in a disposition of the present point upon that consideration. We have concluded, however, to determine the point now under discussion from the standpoint of the evidence, not from that of the indictment, as the evidence indisputably shows that appellant was convicted of two crimes which either arose from the same transactions or events or which were connected in their commission. This state of the evidence is so plain that the remark cannot be forborne that the draftsman of the indictment should not have made it a statement of separate crimes of the same class. We take up, then, the point made by appellant. The contention that his conviction of the lesser offense was an acquittal of the greater is predicated of several decisions. These are, mentioning only California cases, *People* v. *Ny Sam Chung,* 94 Cal. 304 [28 Am. St. Rep. 129, 29 Pac. 642]; *People* v. *Defoor,* 100 Cal. 150 [34 Pac. 642], and *People* v. *McDaniels,* 137 Cal. 192 [92 Am. St. Rep. 81, 59 L. R. A. 578, 69 Pac. 1006]. Authorities from other jurisdictions are also relied upon, but as they are to the same import as the cases decided by our own courts, it will not be necessary further specifically to mention them. [4] The cases upon which appellant places reliance are all to the effect that when a defendant has been acquitted or convicted of a particular offense and he is *subsequently* and in another trial attempted to be prosecuted for another offense against the same property right or against the same person, both offenses arising upon the same facts and one being or constituting a necessary element in the other, the second prosecution must fail for the reason that the defendant has been once in

jeopardy. In a case of that character it is not incorrect to say that the jeopardy of the defendant at the first trial substantially amounts to an acquittal of the offense for which it is sought to try him at the second, but this is not such a case. Here defendant was tried at one and the same time and upon the same evidence under both of the charges against him, and the verdict as to each offense was returned at the same time. [5] Appellant's point is apparently made to depend upon the fact that the verdict finding him guilty of an assault was read by the clerk, after the two were handed to him by the foreman of the jury, before the reading of the verdict finding him guilty of an attempt to commit rape, but this circumstance surely cannot make available the cases cited by him. One of the verdicts must necessarily have been read by the clerk before the other was read, just as the first word of each verdict must have been read before its last word. Doubtless the verdicts were read as they were for the reason that the one first read was responsive to the first count of the indictment, while the one last read responded to the second. This was the logical course for the clerk to take in the reading, but the reading in that order, or, in fact, a reading in what may be termed an inverse order, cannot change the indubitable fact that there was but one trial, with two verdicts rendered at the same time pursuant to the trial.

The particular point presented by appellant is thus seen to be utterly devoid of merit. Whether one of the verdicts must fall on the ground that one of the offenses of which appellant was found guilty is included within the other, both having been found after one trial and at the same time, granting that one offense is included within the other, is a question not specifically presented. It is probable, however, that we should consider that the point is sufficiently made, within the broad lines of appellant's argument, that the verdict under the second count, finding appellant guilty on the more serious charge, should fall under the circumstances which actually exist in the cause. This specific point is also without merit. [6] Although section 954 of the Penal Code allows the joinder in one indictment of two or more charges under different counts, where the defendant by his one act or through one transaction violates two or more sections of that code, and permits as many verdicts

as there are counts, it is possible that the accused is punishable upon but one of the charges, under the provisions of section 654 of that code. By this it is not meant, however, that where, as here, a defendant is convicted upon two charges made under section 954, he is to be punished only for the commission of the *lesser* offense of which he is found guilty. It was said in a quotation found in *People* v. *Defoor, supra,* a case, it will be remembered, in which a second separate prosecution against the defendant was attempted, ''the prosecutor may carve as large an offense out of it [a single transaction] as he can, but it is said 'he must cut only once.' '' If we grant without deciding that, because of section 954, no punishment may be imposed under one of the verdicts in the present case, and that a jury, like a prosecutor, can cut effectively but once when it carves out of the facts of a single transaction, it must be true that, like the prosecutor again, the jury may carve as large an offense as it can. It seems obvious that if appellant must go unpunished under either of the verdicts, it must be under the one finding him guilty of the lesser offense, not the one convicting him of the greater. We do not decide, however, that either verdict must fall, for the reason that, as we shall now point out, we are of the opinion that both were erroneously arrived at.

The trial judge limited counsel for appellant in his cross-examination of the complaining witness, and appellant contends that the barrier thus supervened was so injurious to his substantial rights that a reversal must follow from the action of the judge in erecting it. It is also insisted that the judge was guilty of prejudicial conduct in certain remarks which he made in the presence of the jury, in connection with the rulings by means of which he limited the cross-examination of the prosecuting witness. The two points may well be considered together.

The prosecuting witness, a married woman living apart from her husband, and whom we shall henceforth designate as E. C., had known appellant for a period of nearly four months preceding the happening of the events upon which the indictment was based. He had frequently visited her at her home and had often driven her about in his car. He had an office or laboratory in a certain business building and E. C. had gone with him to that place in the evenings,

sometimes as often as three or four times each week, where,
as she herself testified, she often spent several hours with
him. On these occasions, she said, she witnessed the con-
duct by him of certain laboratory experiments in which she,
a woman of considerable mental endowment, judging from
the evidence, was much interested. The residence of E. C.
was in that part of Los Angeles known as Hollywood, while
appellant's laboratory was in the business portion of the city
proper. In their joint excursions into the field of experi-
mentation E. C. and appellant became desirous of subjecting
a photographic camera to certain tests and they determined,
according to E. C., that these tests could best be made at
San Diego. They accordingly arranged a trip thither. E. C.
says it was planned that she should go to San Diego by
railroad train and that appellant should proceed to that
city in his automobile, that they should meet there, and that
they should also be met by a married couple who were to
act as chaperons during the trip for the benefit of E. C.
The latter says that the journey was taken as contemplated,
but that when she met appellant in the lobby of a hotel
at San Diego he informed her that through some misunder-
standing the married couple would not be able to enact the
roles assigned to them in the preparations made for the so-
journ in the southern city. E. C. says that she was dis-
satisfied with this outcome and insisted upon returning im-
mediately to Los Angeles. Appellant then offered to drive
her to that city. She accepted the offer and the return
journey was commenced in the manner indicated. However,
according to E. C., appellant became ill before La Jolla was
reached, so ill that they both agreed that the journey could
not at once be completed, and they stopped at the Cabrillo
Hotel at La Jolla to await the recovery of appellant. They
remained at the hotel that night. At noon the next day
appellant told E. C. that he had received a telephone mes-
sage from the married couple to the effect that they would
arrive in San Diego from Los Angeles on the evening train
of that day. E. C. and appellant accordingly remained at
La Jolla a second night and drove to San Diego the next
morning. Their friends were again not in evidence and
E. C. says she told appellant the situation looked strange
and insisted upon driving at once to Los Angeles. The
journey was undertaken and the two reached Los Angeles

that evening. E. C. testified that her railroad trip to San Diego was on a given Saturday and that she and appellant reached Los Angeles on the return trip on the following Monday. It is to be understood that in narrating the events of the San Diego trip we have stated the version of E. C. throughout. Considering now for a moment the facts more immediately touching the charge against appellant, the alleged crimes having been committed in E. C.'s residence at Hollywood, E. C. testified that she and appellant had never indulged together in the sexual relation, that she resisted his attack upon her on the date named in the indictment, and that she succeeded in preventing the accomplishment by him of the final act which it was his purpose to perform.

A consideration of the two points presented by appellant involves the necessity of making copious quotation from the record. When the direct examination of E. C. was about to be concluded an argument took place, but no showing is made by the record as to what precipitated it. At the conclusion of the argument the trial judge said in the presence of the jury: "I am familiar with the cases; they relate entirely to alleged immorality by the prosecuting witness occurring prior. . . . If it was a case where there was consent, the consent becomes material. Supposing the defense should be that the defendant did not do it and was not there at all, and of course, inquiry into the moral character of the prosecutrix would be absolutely futile and immaterial from every standpoint; and the Court is going to permit you to inquire point-blank as to any claimed immorality you may claim existed prior to that time between the defendant and this witness, or for that matter any other witness, but it will have to confine itself to a short inquiry because we are not trying the witness, we are trying the defendant as to what took place on a certain date. . . . You are not getting anywhere in this trial by going into evidence going into everything that every person did in their whole life and all of those matters. As I understand the decisions they relate point-blank to the proposition that it would tend to prove a consent if there are previous immoralities of the prosecutrix, and that is all. If there are any alleged immoralities the court will permit you until it appears to the court to be entirely immaterial to inquire whether there was such im-

morality, but I am not going to inquire into the proposition of where people went, whether they went by stage or rail or some other way and where they stayed and what they said on the way and all those things. This case has to be cut shorter than that. It is entirely improper to get outside of the main case which concerns what happened on a certain evening in Hollywood.''

After a few questions addressed to E. C. on further direct examination the cross-examination then proceeded. It appeared that a friend of E. C.'s had asked permission to bring appellant to her home and it was in this manner that the meeting of the two came about. It was the custom of E. C. to deliver lectures at her home frequently in the evenings, and on one of these occasions on April 6, 1923, appellant first appeared at her place of residence with her friend. On the next Sunday evening succeeding that date appellant called upon E. C. at her home and some days afterward—she testified she could not say whether it was as much as a week later or whether it was not—she made the first visit to his laboratory. With this preface we quote from the record: ''Q. By Mr. Davis [counsel for Appellant]: I will ask you this— . . . you say you went to the laboratory to perform some work. State what was done, any work that took you three hours to do or any longer time. Mr. Burke: Objected to, not material to the issues in this case. The Court: Sustained. Q. . . . Isn't it a fact that you went there and stayed with Mr. Degnen until about a quarter after 1 o'clock, and that there was no experiment of any kind conducted by you or him at that time? A. That is not true. Q. Well, then, please tell us what the experiment was.'' Upon objection being made to this question the following occurred: ''Mr. Davis: I think we have a right to go into that. The Court: No;—in regard to previous actions that relate to some clean-cut immoral nature or— All others are entirely immaterial, and we are not going to investigate. Mr. Davis: Except to get at what she says was done at that time. This testimony was all introduced for the purpose of showing one thing—we realize that as between these two people— The Court: I do not care what you realize, unless they amount to immorality. You can ask anything of immorality, and I will permit that, but we are not going over her whole life. . . . It is utterly out of the question

to attempt to go into everything that has happened between these people during an acquaintance of two or three years— . . . If you think and believe it is going to be material to prove that an act of adulterous intercourse took place on this occasion mentioned in the information, that it was with the consent of the prosecuting witness, you have a right to show previous acts of immorality, but if it did not turn out that way, the question of consent is not material, of course. As soon as that time arises, the Court would cut off any further inquiry, but the Court would not anticipate your defense, and will assume if any situation is going to arise which would permit the introduction of testimony of that kind and therefore allow you to ask whether or not she has been guilty of any immoral act with the defendant, and possibly even beyond that, but the Court is not going to go over in detail everything that has been said and done with this witness in her whole life, with the defendant or anybody else. Mr. Davis: I am not going to go over the lady's life—I want that portion of her life that she has given to the jury—I want this because everybody, and yourself and all of us, must realize that this man is charged with two of the most serious offenses known to the law, . . . and I must rely upon circumstances to establish his defense, or upon the breaking down of her testimony by showing it was improbable in this instance. The very largest latitude is allowed, and . . . we will ask your Honor, in view of the seriousness of this charge, in view of the jeopardy in which this defendant now stands . . . to give us an opportunity to lay before your Honor authorities upon that subject, and in order that it might not come before the jury we would ask that they be sent out until this matter can be heard. Your Honor must realize that this man's liberty is worth something, his reputation is worth something. . . . We will take only a short time. . . . It is going to arise and going to be ·more insistently urged on our part when it comes to this matter your Honor is speaking of, with reference to the San Diego trip. It is of most vital importance and around it hinges the circumstances upon which we hope to establish the innocence of this man. . . . The Court: It makes no difference if she might be guilty of some immorality, much less would it be material if she was given to some indiscretion or if she did something some more

prudent woman would not have done—but here is the case—
we are trying the proposition of an alleged rape and assault
with intent to commit murder that occurred on a certain day.
There must be an end to all things and we cannot go into
everything in the world.  I desire to be fair with the de-
fendant and give him every opportunity, but you must re-
member there is a reason why the law does not permit a
person to be cross-examined with respect to many things
and the reason is this—in the first place no one's memory
is perfect and no witness can be presumed to remember
with precision everything that has happened in his or
her life, so that it is utterly impossible.  If you should cross-
examine a witness over her entire life or over years of her
life and not find some point where her memory would be
bad, you would say she was not telling the truth and commit-
ting perjury—the law does not permit that inference, her
recollection is supposed to be connected with respect to things
material and she is supposed to be able to correctly remem-
ber them and to testify to them but you cannot go into a great
mass of conversation covering years—it is unreasonable as
to the witness and unreasonable as to the court and to the
public—who have a right to expect there will be a reasonable
dispatch of business; if it arises in the course of the case
that the intercourse between the plaintiff and defendant
upon the night in question was with her consent and not
as a result of force, then the defendant is permitted to show
by any competent testimony that the woman in the case
is an immoral woman, solely for the reason of showing the
probability it was with her consent.  That is the only ele-
ment in the case upon which any question can be raised as
to previous conduct of the prosecuting witness. ' If it is
not for that one thing, the testimony would be limited ab-
solutely to what took place that night, and the corrobora-
tion, if any.  It is for that reason, I say, we are absolutely
precluded, both by common sense and by the law, from going
into details, into every conversation which ever took place
between these people months before, perhaps years before—
both for the reason that it was improbable, that being im-
material that it was implanted on her memory at the time,
and therefore not proper to expect a person to remember,
and would, therefore, not be valuable for the purpose of
cross-examination to test her recollection or truthfulness.

If anything arises, a serious question as to whether or not the intercourse had upon that occasion was by the consent of the prosecuting witness, then for the first time there will arise the query as to whether her past character was or was not such as to warrant the inference she consented to it, and with respect to that we cannot try every instance it is claimed there was some immoral act. We can only touch upon it lightly. The principal case, we must stay with that, and cling tightly to that as possible, only touching upon the other issues quickly and to the extent that it is important to find out whether true or false, if there was some immorality, and this question of conversation is bound to be futile, unless there was some immoral act. It is only to find if there was some adulterous intercourse prior to that time that I will raise the consent upon the occasion in question. Mr. Davis: . . . I have recently looked up this matter and your Honor's theory that you cannot show other acts of adultery or other acts of sexual intercourse except where the party admits that he was guilty of the act he was charged with and says it was with the consent, we have the authorities in abundance that a man who is charged with sexual intercourse upon a minor under age, and he stands denying it every minute, we can show that the Court says that the prosecution may show that at various other times prior to that time he had sexual intercourse with that girl. He may, because it is material to show, he may show that she did. The Court: I admit that you can show that. Mr. Davis: It is not with consent, because consent did not avail him anything. It does not have to be shown that he had sexual intercourse with her consent, but it goes down to the jury that she must establish it beyond a reasonable doubt before we are entitled to put in any evidence, or before we are called upon to put in any testimony, and the jury are entitled to have all the circumstances leading up to this alleged act before them, and to determine before they hear one word from him as to whether or not her story is the truth, and whether or not there was any such thing as that occurred. Now, that is what I am trying to get. . . . The Court: I agree with you entirely on that. The only question is, I am not going to permit every little episode in their lives to be threshed out separately. If there is any time you can bring to the attention of this witness where

you claim she was guilty of some immoral act with the defendant, with somebody else—Mr. Davis: It must be apparent to your Honor that she would not say that she was; it must be apparent . . . if I ask her and she said no I am bound and I could not put on a witness to disprove it. Then where is your Honor placing me at this moment? The Court: No. I don't say that is correct. I say it might subsequently arise it is immaterial and that is where you are taking your chance. Mr. Davis: I am taking no chances. . . . I am not going to be driven into the direct question, 'was any immoral act committed' and she says, 'No.' . . . The Court: You are not bound by it, but it might be immaterial. I am not going to try every incident in their life. If there is any particular act of immorality you want to bring out I will permit you to bring it out. Mr. Davis: We cannot bring it out by asking her the single question if that is so. The Court: That means you can go inquiring along all her life to see if you can find something. Mr. Davis: I do not want to take her over any territory Mr. Burke [the deputy district attorney] did not take her over in placing her story before this jury. . . . The Court: What was the last question, Mr. Reporter? (Question read.) Mr. Davis: She detailed to the jury all that occurred in that laboratory at that time and we want to show that nothing of that kind occurred and I was cross-examining her to find out if anything she said did occur there and to find out I asked her and I ask you now what it was, to detail to this jury what those experiments were, what they consisted of. The Court: Objection is sustained. I don't care what they were. Mr. Davis: I have forgotten, and I beg your Honor's pardon, if I may transgress your rules, but I want to keep the record straight in this case and I will ask this question: Q. Tell us the conversation then that occurred there that first night during the hours that you were there, between you and Mr. Degnen? Mr. Burke: That is objected to as incompetent, irrelevant and immaterial, not bearing upon any issue. The Court: If there is anything you remember you have not related to the jury you .may state it. A. There is no— Mr. Davis: Your Honor. on cross-examination are we compelled simply to let her restate. what she said on direct examination? That is not the rule of cross-examination as I understand it. The

Court: No, but it is there once and it is not necessary to say, 'Have you testified so and so, or this, that and the other?' We will never get anywhere with that. You say you don't remember anything else? A. No, sir; there is nothing I have not already stated. The Court: That is enough for that. Q. By Mr. Davis: You stated, Mrs. Witness, you and Mr. Degnen were down there and you took notes? A. Yes. Q. Now, where are your notes? A. I have some. Some of them are in Mr. Degnen's handwriting at home and if necessary I can produce them. . . . Q. And didn't Mr. Degnen take some notes himself? A. If he did I really don't know because you must understand that it was not an exchange of knowledge at that time, Mr. Degnen acted in the position of my preceptor; he was teaching me. Q. Then I would like to know what he taught you that night. Mr. Burke: I object to that as incompetent, irrelevant and immaterial. Q. By Mr. Davis: Tell us what he taught you at that time? The Court: Objection is sustained. . . . Q. Now, how long was it before you saw Mr. Degnen again? A. I don't remember. I have already stated that I gave up about an average of three or four evenings a week for the laboratory work. . . . Q. Now, can you tell us, and will you tell us anything that occurred between you and Mr. Degnen at any time after that first visit to his laboratory, at his laboratory when you and he were there? Mr. Burke: If your Honor please, that covers a good deal of territory. The Court: There are about fifteen or twenty pages of what occurred in the laboratory already of record. Mr. Davis: I know, your Honor, but it has been held . . . on cross-examination you can ask a witness to go into exactly the same statements in order to see if she tells the same facts. The Court: Certainly, with respect to the material things. If you want her to repeat what occurred at the house, I will permit her to repeat them, but it is going a long ways to say we are going to fill this record up with such matters which amount to nothing, that are immaterial in the case and which will be stricken out on motion. Mr. Davis: I take an exception as to the statement of the Court that these were such matters that amounted to nothing, and assign the statement of the Court as error, and I ask the Court to instruct the jury to disregard it entirely. The Court: The Court will instruct the jury both here and there

with respect to anything that took place at her house or at his laboratory, unless they amounted to immorality, they are immaterial to the case. Mr. Davis: I take an exception to that statement of the Court and assign it as error, and ask that the court instruct the jury to disregard it. The Court: All right. Go on with the case. Mr. Davis: You mean all right, you will instruct the jury to do so, or it is all right for me to take an exception? The Court: Proceed. Of course, there is an exception to that. There was certain evidence with respect to certain things that has a certain relevancy to the case. What I mean is, certain matters which do not lead up to this particular offense. Mr. Davis: But may I have a ruling on my motion? The Court: Your motion is denied. Mr. Davis: I don't like to have a motion and have your Honor say, 'You have an exception to my statements to the jury,' because you can see where I stand and where the defendant stands. We ask your Honor to make a clear-cut ruling in these matters, so that we may have the advantage of it. The Court: The motion is denied. . . . Mr. Davis: Then, as I understand it, they are instructed to disregard all that testimony as immaterial, or all the testimony with reference to anything except the day of the incident,—is that it? The Court: No; no. There are certain things which led up to this proposition which are material, but nothing is material which does not tend to show some affection by the defendant towards the witness, or some desire to satisfy his lust upon her in some way, or something of that sort, to show a desire for intercourse upon his part; if anything does not lead up to that, it was immaterial in the first place. Mr. Davis: Well, again, I take an exception to the statement of the Court and assign it as error, and ask that the Court strike it out from the consideration of the jury, that last statement particularly. The Court: Objection overruled. Motion denied. Proceed with your case."

The record then shows several pages of cross-examination, during which the witness testified that appellant had proposed marriage to her at his place of residence, whither she had gone with him. This proposal was said to have been made after the two had been together at appellant's laboratory at night on various occasions. The following then appears: "Q. Will you tell us what your experiments were

between the time when you first met him [at the laboratory] . . . and the time you say he proposed marriage to you? Mr. Burke: I object to that as incompetent, irrelevant and immaterial. . . . The Court: Objection is sustained.''

Appellant resided in a home which was also occupied by a Mr. and Mrs. C. It is shown by the record how E. C. happened to be there on the occasion when appellant proposed marriage to her. E. C. testified that she was at the laboratory one evening working late; that when she got to her home she discovered that in changing her dress she had not put her key in her purse; that appellant suggested her going to a hotel, but that she said she would not, for the reason that the type of hotel that would take her at that hour without baggage was not the character of hotel she would spend the night in; that appellant then suggested her going to his home; and that she was acquainted with Mr. and Mrs. C., having been entertained by them. She accordingly accepted appellant's suggestion. She testified that Mrs. C. made up a divan in the living-room for her, which opened off Mrs. C.'s room; that at her request Mr. and Mrs. C.'s door was open through the night; that next morning Mrs. C. drove her to her home; and that she never had her foot in appellant's room. The record then shows: ''Q. Now then, your home was at 1855 North Kingsley Drive in Hollywood, was it not? A. Yes; it is. . . . Q. Mr. Degnen's is away over here on Alvarado Street, isn't it? A. Yes. Q. Where did your secretary that owned the key live at the time when you went to his house rather than get your key from the secretary? . . . A. My secretary was moving, at the time I believe, or something of that sort, she is living at the Christian Women's Home, I believe it is called, and I didn't know her telephone number. That is why. . . . Q. You knew where she lived, didn't you? A. No; I did not; I did not know. Q. Do you swear positively to this jury that she moved at any time within a month of that time with that key? A. It was a new building. My secretary is here, she can answer that question. Q. I know, but you are the one that is being asked the questions. The Court: Do you recollect if she moved within a month of that time? A. I know my secretary—it was some circumstance of that sort. Q. By Mr. Davis: You can answer that by yes or no. . . . A. I know there was a legitimate reason that

either my secretary— Mr. Davis: We ask that be stricken out, your Honor, and the witness instructed to answer directly these questions. The Court: The witness will give her best recollection of the matter and if she doesn't remember she can say so. A. I do not exactly remember the circumstances. Q. By Mr. Davis: You don't remember the circumstances, but you can state to this jury positively why you did not go to the secretary and get your key rather than to go to his house and stay all night? A. It was rather late, besides that, when Mr. and Mrs. C. . . . who are reputable people, were to be there to chaperon, I think it would be casting a reflection upon them to suggest anything immoral there. A. I am not suggesting anything immoral. The Court: Why are you going into it if there did not anything immoral happen there? Let us go on to the next things. Mr. Davis: Your Honor, I feel loath to have to take an exception every minute. The Court: You can take every exception you see fit, but unless there was something immoral in her conduct it is totally immaterial and a waste of time. . . . I don't know that her visit out at that house, if there was not anything immoral to it, had anything to do with this case, unless her previous conduct was immoral it becomes immaterial in this case. Mr. Davis: The jury has to determine that and not your Honor or myself. The Court: No, but I have to determine myself first whether it tends to show immorality. It does not tend that way even. Mr. Davis: We take an exception to the court's remark and assign it as error on the part of the court and we ask the court and move the court to instruct the jury to disregard it. The Court: Motion is denied.''

It was the contention of appellant throughout the trial— and there was much evidence to support it, as we shall later point out—that E. C. and appellant returned from San Diego to Los Angeles on Tuesday instead of on Monday, and that they lodged at the Cabrillo Hotel on Monday night, as well as on Saturday and Sunday nights, on what we have above referred to as the San Diego trip. We shall anticipate our statement of the evidence mentioned in the last preceding sentence so far as to say that there is testimony in the record to the effect that on Tuesday appellant and E. C. called at a dog hospital, in appellant's car, to pick up a canine which E. C. had left there before proceeding on the San Diego

trip. During the cross-examination of E. C. the following occurred: "Q. When did you go and get the dog at the hospital? A. That I don't remember. Q. Didn't you go directly on Tuesday after you got back from San Diego with Mr. Degnen, and get the money from him, and go right in and get the dog? A. I never did. I am not in the habit of accepting from Mr. Degnen or any other men. . . . Q. Did you get the dog that day? A. That I don't remember, that I got my dog. . . . Q. Do you know who went with you after the dog? Mr. Burke: I object to that. . . . The question has been asked and answered she does not remember, consequently she does not remember who went with her, of course. The Court: She has answered the question sufficiently for an immaterial circumstance like that. . . . Mr. Davis: We want to except to the statement of the Court that it is an immaterial circumstance, and assign it as error, and ask the Court to instruct the jury to disregard it. The Court: Overruled. Motion denied."

In these extended quotations from the record the question is suggested whether one who is charged with rape by force and violence and who denies absolutely the charge, as did appellant here, may yet offer evidence showing acts of carnal intercourse between him and the complaining witness which occurred prior to the date fixed in the charge. A consideration of this particular point may well serve as a preface to a discussion of the two points made by appellant, that is, that the trial judge erred in limiting the cross-examination of E. C. and in making prejudicial comment in the presence of the jury in connection with his rulings affecting the right more fully to cross-examine. [7] We find no authority emanating from the courts of this state upon the particular question above suggested, but it is the undoubted rule here, no matter what it may be elsewhere, that in a prosecution for rape by force and violence unchaste acts of the prosecutrix committed with other men than the defendant may be shown for the purpose of disproving the allegation that the act charged against the defendant was perpetrated through the exercise of force, and despite the unwillingness of the prosecutrix (*People* v. *Benson*, 6 Cal. 221 [65 Am. Dec. 506]; *People* v. *Shea*, 125 Cal. 151 [57 Pac. 885]). This rule exists in California, as a perusal of the opinions just cited will demonstrate, in opposition to the weight of authority

in other jurisdictions, the rule supported by such authority
being that particular acts of lewdness with other men may
not be shown, but only the general reputation of the prose-
cuting witness for unchastity. As lewd acts with other men
may be proven in our courts as a defense in prosecutions
for rape, it is plain, upon much greater reason, that such
acts with the defendant may be proven. If evidence of
specific acts of misconduct with men other than the defend-
ant tend to prove that the prosecutrix consented to the act
charged against him, the probability of that consent is surely
more strongly predicable of a showing that she had formerly
submitted herself to the embraces of the defendant himself.
We are clearly of the opinion that the latter character of
evidence is admissible in such cases. And we can conceive
of no reason why such evidence is inadmissible in a case
in which the defendant contends, as appellant here contended
at the trial, that he committed no lascivious assault whatever
upon the prosecutrix. [8] The two principal elements of
the rape are, first, the commission of the act, and, second,
the lack of consent of the victim to its commission. The
burden is upon the People to prove both these elements, of
course, and it is inconceivable that the defendant may not
offer proof to rebut the evidence introduced by the prosecu-
tion in support of each of the two branches of the case.
In civil actions it is the well-established rule, expressed, in
fact, in the statute (Code Civ. Proc., sec. 441), that a de-
fendant "may set forth by answer as many defenses . . .
as he may have"; and it is well settled that the terms of
the section permit the allegation of inconsistent defenses
(*Calexico Lumber Co.* v. *Emerson,* 54 Cal. App. 239 [201
Pac. 612]). These, of course, are rules of pleading, but a
similar rule, as a matter of evidence and independent of
statute, would seem necessarily to apply in criminal cases
under the issue presented by a plea of not guilty. It were
strange indeed if a defendant were not permitted to intro-
duce evidence to countervail proof presented by the prose-
cution for the purpose of establishing a fact necessary for
the prosecution to prove.

[9] Taking this point, then, as settled, the next question
arising is whether, on the cross-examination of the prose-
cuting witness in a rape case, the defendant may put ques-
tions calculated to prove that she had, previous to the time

set in the charge, willingly submitted herself to his carnal embrace, or, if not proving the fact, tending to affect the credibility of her story that the alleged criminal act was resisted by her, and, in fact, the credibility of her entire testimony. [10] And we have not here a case in which the prosecutrix merely recited the occurrences of the occasion mentioned in the indictment, including her statement that she resisted appellant's assault upon her honor, a situation which might make less clear the right to cross-examine for the purposes indicated, but she told a story of her association with appellant from the time she became acquainted with him, in April, 1923, to the day in July of the same year upon which it is charged that his crimes were committed. Particularly, coming nearer to the points involved in the rulings and conduct of the trial judge, she told of her frequent visits to his laboratory at night, and, in a general way, at least, of the "experiments" which she says were conducted there. The prosecutor doubtless took her over all this ground for the purpose of convincing the jury of the heinousness of appellant's conduct on the occasion which is principally of interest here, and of demonstrating to that body that she had a right to be alone with him on the occasion when the alleged crime was committed and to expect conduct from him of a character totally different from that with which he was charged. The evidence was entirely proper for the latter purpose, to say nothing of the purpose first stated. In a case in which the defendant was charged with a rape committed upon the person of his sister-in-law it was said, after the discussion of another point: "Neither was it error to tell the jury that 'they had a right to consider the relation existing between the parties, as tending, in some degree, to show that the prosecutrix had a right to trust herself to the defendant without fear of molestation or harm from him.' If it was a circumstance of any importance in the case, we think the instruction of the court correct. Surely, the prosecutrix had a greater right to repose confidence in the husband of her sister than in a stranger" (*People* v. *Mayes,* 66 Cal. 597 [56 Am. Rep. 126, 6 Pac. 691]). This language refers, it is true, to a relationship by affinity, but we can have no doubt that it has a ready application, in principle, to a relationship or to an association arising through friendship. We think, therefore, that the

testimony of E. C. on direct examination, showing the character and extent of her association with appellant, was entirely proper and that it did not bring forth mere collateral matters. There could be, then, no objection to the cross-examination of E. C. which appellant's counsel sought to pursue, upon the theory that it was not within the lines laid by the direct examination.

The trial judge sustained an objection to the following question propounded to E. C. on her cross-examination: "I will ask you this— . . . You say you went to the laboratory to perform some work. State what was done, any work that took you three hours to do or any longer time." An objection to the following question was sustained: "Well, then, please tell us what that experiment was." The witness was also asked: "Tell us the conversation then that occurred there that first night during the hours that you were there, between you and Mr. Degnen." An objection was then interposed and the judge in effect sustained it, for after himself asking the witness whether she had on her direct examination stated all she could remember of the conversation and getting an affirmative answer, he said: "That is enough for that." This question was put to the witness: "Tell us what he taught you at that time." An objection was interposed and it was sustained. Although there appears to have been no express ruling upon it, the judge in effect sustained an objection to the following question: "Now . . . will you tell us anything that occurred between you and Mr. Degnen at any time after that first visit to his laboratory . . . when he and you were there?" An objection was sustained to the question: "Will you tell us what your experiments were between the time when you first met him [at the laboratory] . . . and the time you say he proposed marriage to you?" Finally, an objection was sustained to the following question: "Do you know who went with you after the dog?" We cannot but be convinced that the trial judge erred in sustaining the objections to each of these questions. None of them was itself of transcendent importance, it is true, but there were behind them questions of graver import. [11] In the remarks of the judge which we have above quoted so liberally, made in connection with the rulings, appellant's counsel was told, in effect, that he could inquire as to immoral conduct between

E. C. and appellant only by putting to the former direct questions as to whether the two had together committed sexual intercourse upon specified occasions and that he then must take her answers to such questions. This position of the judge exhibited an altogether erroneous view as to the purposes of a cross-examination of E. C. and as to the right of appellant to subject her mind to a searching and vigorous inquest through his counsel. **[12]** The matter of her alleged or supposed immoral conduct with appellant was not one of impeachment, under rules compelling appellant to put only direct questions to her and forcing him later to prove what he contended was the actual fact by witnesses in his own behalf. He had the right to prove her misconduct, if any there was, out of her own mouth, if he could, either directly or by circumstances from which the jury might justly infer that she had been guilty of misconduct, and for that purpose his counsel had the right to embark upon a searching cross-examination, limited only by the very broad lines of the direct examination. **[13]** The truth must not be overlooked, also, that, aside from the question of E. C.'s alleged immoral conduct, appellant had the right vigorously to cross-examine her as to every material feature of her direct examination for the purpose of destroying, if he might, her credibility as a witness in general and as to every material part of her testimony. It was said in an early opinion rendered in a cause in which the defendant was charged with rape: "There is no class of prosecutions attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless . . . " (*People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506]). In such cases especially, therefore, the defendant should not be held to a sparing exercise of his right to cross-examine the prosecuting witness, but should be permitted to interrogate her narrowly and thoroughly. This right was denied appellant in the present instance, and it remains only to inquire to what extent his substantial rights were probably damaged by the erroneous rulings of the court.

The testimony of E. C. was contradicted in many particulars. She was asked, for instance, whether on a certain Sunday she did not go with appellant to Santa Fe Springs, at which place they took luncheon in a tent near the oil

wells of the locality, upon the invitation of a named individual, and near which place an aeroplane fell to the ground, killing its driver and a young woman who was with him. She denied that such a trip was taken and denied all knowledge of the circumstances stated for the purpose of refreshing her recollection as to the occurrences of the alleged visit to Santa Fe Springs. Not only was she contradicted in this denial by appellant, who, however, did not mention the aeroplane incident and who said that he and E. C. did not remain for luncheon in the tent, but by a sales manager of one of the oil companies operating at Santa Fe Springs. It was he who invited the two to partake of luncheon in the tent, but he said they did not remain for that purpose. He mentioned the aeroplane incident as having occurred immediately after E. C. and appellant left the place. Another contradiction of E. C. arose from certain of her testimony concerning the male member of the married pair who, according to E. C., were to have acted as her chaperons on the San Diego trip. She testified that she had met this man a month before the San Diego trip, while he testified that they did not meet until at least ten days after that event. E. C. was also contradicted in this regard by appellant. Another contradiction occurred with relation to an incident of the San Diego trip. Appellant testified that he ordered a breakfast sent to E. C.'s room on one morning at La Jolla and that she ate the breakfast in the room, he being present. She testified that no breakfast was brought to her room at La Jolla. The proprietor of a restaurant at La Jolla corroborated the testimony of appellant upon this subject. Further, and so far as the number of witnesses is concerned, there was a wholesale and substantial contradiction of E. C.'s entire story of the San Diego trip, which story is stated above. Appellant testified that the excursion began on a Friday and not on a Saturday, as testified by E. C., and that the return to Los Angeles was on the following Tuesday and not on Monday. Appellant said that the journey was not undertaken for the purpose of testing a camera and that no camera was taken on the trip. He said that he and E. C. took the journey for pleasure only and that no chaperons were talked of either before or during the sojourn in the vicinity of San Diego. He testified that E. C. did not go to San Diego on the train, but drove down with him

in his car, after they, in company with another man, had
left her dog at an animal hospital. A nurse at this hospital
testified that on that day E. C. and two men brought the
dog to the place in an automobile, one of the men being
appellant, and that E. C. said she was on the way to San
Diego and that she was in a hurry to get started. An at-
tendant at the hospital testified that he heard E. C. say
that she was on the way to that place and was in a hurry.
Appellant testified that neither he nor E. C. was at any
time during the trip at the hotel in San Diego at which
she said she met him. He said that the town of Tia Juana,
across the Mexican border, was the main objective of the
journey and not San Diego, and that they did not stop at
the latter place on the way to Tia Juana, except to take
dinner at a restaurant, but drove to National City, where
they spent Friday night at a small hotel. He testified that he
registered them at this hotel as "M. L. Degnen and wife,"
and that they occupied the same room during the night. The
hotel register was produced at the trial and it showed, under
the date specified by appellant, the entry above noted. The
manager of the hotel identified E. C. as having been at the
place with appellant at the time mentioned, and corrobo-
rated appellant's entire story of the sojourn there. Appel-
lant testified that he and E. C. left the hotel at National
City at 11 or 12 o'clock on Saturday morning and drove
to Tia Juana, where they remained until toward evening.
He said they both drank intoxicating liquors at two differ-
ent resorts and that they thereafter went to a place in Tia
Juana called the "Mint Saloon," where, after a drink or two
at the bar, they retired to a booth and drank heavily until
their departure in the evening. He testified that they drank
frequently during the afternoon with the bartender of the
saloon and with another man who was about the place. Both
of these men were present at the trial and they corroborated
the story of appellant in every particular, except, as to
exact date, identifying E. C. as the woman of the occasion.
Although these witnesses did not fix the date as to day,
they did specify the time as being within a day or so of
that testified to by appellant. The latter testified that after
this alleged adventure he and E. C. were heavily intoxicated,
he being so much so that after driving his car across the
national boundary on the return he was forced to employ

a chauffeur, who drove them to San Diego. This man did not appear at the trial, but appellant testified that he had made a search for him, and that he could not be located. Appellant testified that upon arriving in San Diego he and E. C. had dinner at a café there and that thereafter they drove togther to La Jolla. He denied that, as testified by her, he was ill on the way to that place, but said that he had a "hang over" from the drinking at Tia Juana. He testified that at the Cabrillo Hotel he, in the presence of E. C., registered her and himself as husband and wife. In her presence, he said, he asked for adjoining rooms with a bath between, but was told that such rooms were not then to be had, but that they could be had later, that E. C. was given a room with bath, that he was assigned to a room some distance away, and that later he was "moved" to a room which opened upon the bath theretofore assigned to E. C. This story of events at the Cabrillo Hotel, up to this point, was corroborated by the hotel register, which was produced at the trial, and by the testimony of the proprietress of the place. She also testified that she addressed E. C. as Mrs. Degnen when she saw her about the house and that E. C. did not demur at being so addressed. The cash-book of the hotel, also produced at the trial, showed that appellant paid for the two rooms and bath for Saturday, Sunday, and Monday nights, not merely for the nights of Saturday and Sunday. Appellant testified, further, that after he was given his second room the bath between his apartment and that of E. C. was kept open and that on at least one night he occupied for a time with her the bed in her room, afterward retiring to his own room, where he passed the remainder of the night. He testified that E. C. and he occupied these quarters at the Cabrillo Hotel on Saturday, Sunday, and Monday nights, and that they together drove to Los Angeles on Tuesday, and that, as already related, they went to the animal hospital and reclaimed E. C.'s dog before proceeding to her home. The nurse at the hospital produced records of the place showing that the dog was reclaimed on Tuesday. An attendant at the hospital testified that the dog was taken out on that day, that he carried the animal to an automobile in which E. C. had driven up to the place, and that appellant was seated therein.

We have not stated all of the respects in which the testimony of E. C. was contradicted, but only some of the prominent instances of contradiction. In addition to these matters of direct contradiction, there was much evidence which was utterly inconsistent with important features of E. C.'s story. The night foreman of the office building in which appellant had his laboratory testified that on one occasion he saw E. C. and appellant leave the building at 3 o'clock in the morning. An elevator operator in the building testified that he took them down in his car one evening when both were intoxicated. A janitor of the building testified that the two came into the place one night after the elevator ceased running, which customarily occurred at 9 o'clock, and that they were both so intoxicated that they had to help each other upstairs, both falling in doing so, and that it took about ten minutes for them to get to appellant's rooms, which were on the third floor. Mr. C., at whose house, as it will be remembered, appellant resided, testified that E. C. was frequently at that place of residence after night, that she and appellant were often intoxicated together there, and that on one of these occasions, when they were both drunk, appellant was so much so that he, Mr. C., drove the two home in appellant's car. That on the trip E. C. and appellant occupied the back seat of the vehicle and that during the ride they hugged and kissed each other—had a "petting party." Mrs. C. corroborated her husband's testimony, with the exception that she said that she never saw anything "improper" between E. C. and appellant.

We do not mean to say that there was no corroboration of E. C.'s testimony, for there was, but that corroboration was largely circumstantial, and taken as a whole it was insignificant when contrasted with the contradictions of her recital. Certainly, if the members of the jury had elected not to believe her, but those whose testimony was opposed to hers, their view that she was an utterly discredited witness would have received ample support from the record. She was disputed at every turn, and not always by appellant alone. If we may judge from the showing made by the reporter's transcript, however, appellant's contradiction of the various phases of E. C.'s testimony was far from being unmarked and unimportant. True, the members of the jury saw the two, and we must not forget the rule of law based

upon that circumstance, to the effect that the verdict of a
jury is to be upheld even if rendered in opposition to what
a court of review may deem to be the weight of the testi-
mony, if there be substantial evidence to support it. We
have here determined, however, that the trial court erred in
its rulings limiting the cross-examination of the prosecuting
witness, and we now engage in an endeavor to satisfy the
provisions of section 4½ of article VI of the constitution,
to the effect that we shall not reverse a judgment under any
asserted error "unless, after an examination of the entire
cause, including the evidence, the court shall be of the
opinion that the error complained of has resulted in a mis-
carriage of justice." In the present instance we have ex-
amined the entire cause, including the evidence. We have
read the twelve hundred pages which comprise the testimony.
In an endeavor to satisfy the constitutional provision we
must look to the record. We have no other guide. In
disposing of the present point, we are not interested in the
question whether there is substantial evidence to support the
verdict. We are to determine only, from the face of the
record, whether the verdict might have been different had
not the errors of the trial court occurred. Under such cir-
cumstances, we repeat that the face of the record shows
appellant's contradictions of E. C.'s story to be worthy of
serious consideration. His testimony was marked by a frank-
ness and openness which are not characteristic of hers. She
was "fresh," evasive, and "smart" in her recital of the
events which culminated in the charge against him. From
the cold face of the record we do not hesitate to say that,
of the two, he was the more worthy of belief. Not only so,
but his version of the relationship between her and him, in so
far as the recitals differ, and regarding each recital in the
light of the undisputed evidence in the case, is more in
accord with the teachings of experience than is hers. In
order to justify this assertion, a statement must be made of
certain features of the evidence which have not yet been
mentioned. We first state some matters which are estab-
lished without contradiction. Appellant's fifty-third birth-
day occurred a few days after E. C. and he first met. Her
thirty-fifth birthday came nearly two months later. He was
a widower, having lost his wife by death a year and a half
before his meeting with E. C. The latter was a married

woman living alone and expecting to procure a divorce from her husband. She was unusually attractive, both physically and mentally. Immediately after their first meeting the two began to see each other with great frequency. She herself said that she was at appellant's laboratory three or four times each week and she saw him at other times at her home and on drives which they took together in his car. They frequently indulged together in intoxicants, although E. C. says that she drank sparingly and was never intoxicated. Their intimacy had so far progressed "shortly" after their meeting that E. C. accepted from appellant a valuable ring as a present. This ring incident seems to us an important feature in the case and we quote at some length parts of E. C.'s testimony concerning it, which occurred on cross-examination, leaving it to be understood that important features of the recital, hereafter to be specified, were disputed by appellant and by the jeweler mentioned in her testimony. Also, the extract will serve to illustrate in some degree the conduct of E. C. on the witness-stand: "Q. When was it that Mr. Degnen presented you with a ring? . . . A. He bought the ring, oh, some time shortly after I met him, and presented it to me for a birth-day gift. Q. Your birthday was on the 30th of May? . . . A. Yes. Q. Is it not a fact that on April the 18th, Mr. Degnen—on April 17th, Mr. Degnen presented you with a ring costing $165, and said, 'This is our engagement ring?' A. That is not true. Q. And did you not the very next day go with him to Lucian, the jeweler, and say you wanted a different kind of a ring, and picked out one that cost $225? A. That is a point that I ask to explain the situation. . . . He did not give me the ring. He bought it in April, and it was not given to me until shortly before my birthday, a day or so before. Mr. Degnen had a ring— what he paid for it, I do not know—I did not know that he had just bought it at that time. I went to his office one day and he showed it to me. . . . When he showed me a ring he had in his possession, which was in a gold setting, and he said to me, 'I want to give you a birthday gift,' and he said, 'Perhaps you would rather have a different setting, in platinum, it is a ring that I bought for a business investment.' . . . Q. . . . When did he first speak to you about the ring he bought? A. I do not know; some time in

April—he had the ring in his possession and showed it to me. . . . Q. You met him on April 6th? A. Yes. Q. How long would you say it was, a week after that? A. Shortly after that, that Mr. Degnen told me that he had appreciated everything I had meant to him, and he knew it was my birthday— . . . Q. He did say to you, anyway, he had a ring for you, didn't he? A. Yes. Q. And you looked at it, didn't you? A. Yes. Q. And you tried it on, didn't you? A. No. Q. It did not suit you? A. It was at his suggestion that it be changed. Q. I am not asking whether it was his suggestion at this time or not, but I am asking you if that ring suited you—that is a question you can answer 'Yes' or 'No' absolutely. . . . It did not suit you? A. No. Q. You told him so, didn't you? A. No, it was his suggestion—he had asked me if I preferred a gold, platinum. Q. I am not asking about his suggestion. You can answer by categorical answers 'Yes' or 'No'—did you tell him it did not suit you? A. He asked me if it did, and I answered him truthfully, 'No.' Q. Did you not go with him to the jeweler the next day in reference to that ring? A. The very same day. . . . Q. You picked out a ring? A. I selected it, yes. Q. Did not Mr. Degnen there in the presence of this man, the jeweler, . . . say, 'This is your engagement ring?' A. Absolutely not. Q. Are you positive that no such conversation as that occurred at all? A. I would not be capable of discussing such a thing— Q. I am not asking about your capability or noncapability—I am asking if there was anything said by you or Mr. Degnen at the time of the purchase of the ring? A. Certainly not. Q. What did you think of that matter of going with him within eight or ten days after meeting him and getting the ring— did you regard that as anything other than his making love to you? A. No, I did not regard it as love at all. Q. What did you regard it as, simply getting it from him? A. I think it is most insulting. Mr. Burke: I object to the form of the question, argumentative. A. I think it is most insulting. The Court: I do not think it makes any difference what her idea was about the matter. Mr. Davis: Isn't that something that must come into it as to the relations that existed between the parties at that time—is it a usual thing for a young lady to meet an old man, and she says she met him within ten days before this and expressed a dissatis-

faction with the one he bought, and went to the jeweler and selected another—isn't that something that can be brought out—is that the usual thing—would you tolerate one of the members of your family? The Court: A lot of old men make fools of themselves and give rings to young ladies. . . . It is not material. A. Ridiculous. The Court: You can prove he gave her the ring, and whether he made any protestations of love. . . . Mr. Burke: I object to it as argumentative. The Court: I think it is argumentative. Q. Now, . . . this episode of the ring that occurred within ten days from the time you met him, had you during that brief interval gone into your life so as to give him your birthday and all that? A. No. Q. How did he know your birthday was about that time? A. I do not remember; I forget the circumstances. Q. You do not have the slightest idea? A. No. I can not tell you definitely, but I know I always make a great deal of my birthday—as a matter of fact, I usually have a little dinner party. Q. This was more than thirty days before your birthday? A. I did not receive the ring. Q. When was your birthday? A. The 30th of May. Q. This was on the 18th of April, wasn't it? A. Mr. Degnen told me he had the ring, which he had in his pocket, and asked me if I would accept it as a token of appreciation for what he knew was going to be a friendship with a woman he was deeply interested in, because of our mental companionship. Q. He was deeply interested in you at that time, this old man, wasn't he? A. He claimed to be. Q. You knew it? A. I respected his mentality. Q. I am not asking whether you respected him—you knew he was deeply interested in you at that time, ten days after you met him? A. Our companionship at that time was considered by me at that time on a mental basis, because he never could appeal to me physically. Q. If you will try to answer me categorically—he told you he was deeply interested in you at that time, didn't he? A. As a friend, yes. Q. Tell us exactly what he said when he purchased you this ring, where it was that he offered it to you, and all that occurred at that time. . . . A. In his laboratory—I had gone down there, I think, some time in the morning—it was during the day, at any rate—and it was in his laboratory. He had this ring in a piece of tissue paper, and he took it out of his vest pocket and showed it to me, and he said to me at

that particular time, he said, 'Little girl, I want you to have a token of appreciation and esteem from me.' I had spoken some time, I think to my friend, Mrs. Wilson, in his presence, of the approach of my birthday. . . . Mr. Burke: You wanted it all. Mr. Davis: A while ago she could not remember anything about her birthday. A. I said I could not remember exactly when or how I came to tell him it was my birthday, but I always make a great deal of my birthday— . . . Q. . . . What did you say in reply when he called you 'Little girl'? . . . A. At that time, I said, 'That is not necessary, I accept your appreciation.' He said, 'No, but I want a material mark of that,'—I really hate to tell you the substance—so ridiculous, you will only laugh. . . . He said that he wanted to place that ring on my finger as a seal of his deep appreciation and regard for the most intelligent woman he had encountered—therefore, I thought it was quite ridiculous that one who knows a person just a short time should make such an exaggerated statement—he referred to me as a goddess, and a few other terms that were quite exaggerated. . . . Q. Nevertheless, you accepted it? A. Not at that time, no, but he asked me—I said to him, 'No, that is not necessary.' He said, 'Yes, I insist.' I did not know how long he had it or anything else—he had it in his possession—he said, 'Now,' he said, 'I will tell you about this ring—some time ago I bought it as a business investment, but I do not want you to have this in gold, I want it in platinum setting,' and I said, 'That would be quite an expense to have it put in the platinum setting,' but I preferred the white gold, 'if you insist upon my having a token from you,' and he said, 'We will go to the jeweler's and make the exchange.' I went to the jeweler's with him, and he said—it was his own suggestion, not mine—I did not like the setting, naturally, when he asked my opinion, but it was his suggestion, not mine, that he selected the larger stone and the ring in white gold, and there was nothing in the conversation at that time to indicate that it was an engagement ring.''

Before we proceed to state the conflicting stories of E. C. and appellant as to their relations, using the foregoing showing made by the record including E. C.'s story as to the ring, as a preface, we must exhibit the extent to which appellant and the jeweler disputed the recital of E. C. con-

cerning the ornament. He testified that before its purchase he and E. C. had agreed to marry, that on the night of April 17th she told him she had been married twice but had never had an engagement ring, that they then arranged to meet at his office for the purpose of going together to buy an engagement ring for her, that on the next morning in passing a jewelry store he saw in the window a ring which he thought had a fairly good stone and which he purchased for $150, that E. C. came to his office between 11 and 12 o'clock that morning to keep the engagement to go together to buy a ring, that he showed her the one he had bought and she said she did not like it—that it was old-fashioned and that she would have preferred if he had waited until she came down to select it, that he told her he had arranged for an exchange of the ring if it was unsuitable to her, that they then together went to the jeweler's to make the exchange, that he did not tell her he had bought the ring as an investment, that when they went to the jeweler's she selected a ring priced at $65 more than the one he had first bought, that he paid that amount for it in addition to the amount he had paid for the first one, that she put it on her engagement finger. This entire story of appellant was corroborated by the jeweler. Appellant further testified that E. C. kept the ring and was highly pleased with it, that he did not tell her it was a birthday gift, that it was not a birthday gift, and that he could not remember whether he knew at that time when E. C.'s birthday would occur.

We now come to the respective stories of E. C. and appellant as to the nature of the relationship subsisting between them. She testified that their association was platonic, that it was always kept on a "mental" basis, that he tried often to become "personal," but that she always checked him, and that she had never accepted money from him until after the difficulty of July 30th, out of which the present criminal charges against him arose, when he gave her money with which to pay physicians and nurses for attendance upon her, made necessary by injuries which she undoubtedly suffered on that occasion. Appellant testified that he had sexual intercourse with E. C. in her home a night or two after he gave her the ring and frequently thereafter, that on several occasions he passed the night with her at her residence, that he began, soon after they met,

to furnish her money with which to keep up her establishment, and that the entire expense of the place was defrayed by him during their association together. He said he gave her various amounts under $40 at various times, of which amounts he usually kept no account, but that he did keep a list of payments to her of larger amounts, making an entry of each amount on the day it was paid, or on the next day. This memorandum was offered in evidence and showed the following payments: April 17th, $100; 27th, $50; 30th, $250; May 8th, $40; 14th, $50; 16th, $75; 28th, $250; June 4th, $40; 8th, $100; 14th, $70; 19th, $200; 28th, $50; July 7th, $25; 9th, $200; 22d, $70. Appellant and E. C. undoubtedly had two serious quarrels or disturbances during their association together. The first occurred about July 10th. She testified that it arose out of his desire to enter her house late at night, when she had forbidden him to see her. He said that it grew out of money matters. The second event was that of July 30th and was extremely serious. Beyond dispute, E. C. was severely injured during the physical encounter which then took place between them. She testified, with particularity, to facts tending to show that the event occurred as laid in the indictment. He said that they were both intoxicated at the time, and that the trouble would not have occurred but for that fact. He said that after July 22d he and E. C. had frequent conversations about money matters, during which he told her that he was giving her more than he could afford, and she said to him that he was a "piker" and was not "coming through" as he should. The subject was resumed with great bitterness, on account of their intoxicated condition, on the night of the 30th. He accused her, in effect, of holding him up, and she then attacked him in great anger, scratching and gouging his face. In the scuffle which ensued through his attempt to hold her and thus protect himself, as he said, the injuries which she suffered occurred, because of falls against objects in the house. The undisputed evidence is that on the next day they both showed on their persons ample evidence of the fact that they had been in a "fight." These evidences, of course, were consistent with the story told by each of them. The injuries to E. C. included a fractured clavicle.

[14] We have now reached the end of our protracted consideration of the question whether the limitation placed by the trial judge upon the cross-examination of E. C. has resulted in a miscarriage of justice. It seems to us that it must have done so. When considering the effect of section 4½ of article VI of the constitution we need only determine, in directing a reversal, that we cannot say "whether appellant would or would not have been convicted but for the errors of the court" (*People* v. *Walker*, 69 Cal. App. 475 [231 Pac. 572]), and we are unable to avoid reaching that conclusion in the present instance. Contradicted, as the testimony of the prosecuting witness was, not only by many other witnesses, but by the teachings of human experience as well, who can say what effect a proper cross-examination of E. C. might have had upon the jury? How great or how little additional weight was necessary to be thrown in the scale against her to impel the jury to conclude that the sordid story we have unfolded was but another instance of the victimizing of a fond and confiding man by a younger, but experienced, woman? We do not say that E. C. did victimize appellant. It is not within our province to say so. We do say, however, that the jury should have been given the opportunity, upon a survey of all available evidence, and especially upon a searching cross-examination of the prosecuting witness, to determine whether she did victimize him, and whether, therefore, appellant should not have been allowed to depart the court, at the conclusion of his trial without day.

We shall say but little concerning the claim that the trial judge committed error in his remarks made in connection with his rulings limiting the cross-examination of the prosecuting witness. We are of the opinion that some of his observations were erroneously made, and, not only so, but that they were materially prejudicial to appellant's rights.

One or two other claims of error are presented, but we find it unnecessary to consider them.

Judgment and order reversed.

Finlayson, P. J., and Craig, J., concurred.