[Crim. No. 868.   Third Appellate District.—January 11, 1926.]

# THE PEOPLE, Respondent, v. THOMAS HUDSON ADAMS, Appellant.

[1] CRIMINAL LAW—RAPE—CHARACTER OF DEFENDANT—EVIDENCE.—In a prosecution for rape, where the defendant made no attempt to prove that he was of good character in respect to the traits involved in the charge, it was not allowable for the prosecution to prove his bad character, even if the evidence produced had related to such traits, it having no tendency to show the relations between the defendant and the prosecutrix.

[2] ID.—OTHER CRIMES—IMPEACHMENT—EVIDENCE.—The guilt of a defendant on trial for an alleged crime cannot be established by proof of general bad character or of other crimes or wrongful acts which have no relevancy to the crime charged, nor may a witness be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony.

[3] ID.—USE OF ASSUMED NAME—ENGAGEMENT IN BOXING CONTESTS—EVIDENCE.—In such prosecution, it was error to permit the cross-examination of defendant relative to the use by defendant of an assumed name and to the fact that he had been engaged in boxing contests.

[4] ID.—COMMITMENT OF DEFENDANT TO REFORM SCHOOL—EVIDENCE.—In such prosecution, it was error to admit proof, on cross-examination of defendant, of the defendant's commitment to the reform school and of his return thereto for incorrigibility.

[5] ID.—EVIDENCE—JUDGMENT.—In such prosecution, notwithstanding that the defendant was properly impeached by proof that he had committed a felony, the jury might, however, have believed him as witness; but when, in addition to the proof that defendant had committed a felony, it was shown that he had been committed to the reform school when thirteen years old, that he was later returned thereto because he was incorrigible, that he had used an assumed name and that he was a prizefighter, it is probable that the jury concluded that he had become so hardened and confirmed in wrongdoing as to be wholly unworthy of belief and so devoid of moral character that he would not hesitate to commit the crime of which he was charged.

---

1.  See 8 Cal. Jur. 54; 8 R. C. L. 212.
2.  See 8 Cal. Jur. 59; 27 Cal. Jur. 132; 28 R. C. L. 623.
3.  See 27 Cal. Jur. 132, 133.
4.  See 27 Cal. Jur. 141,

[6] ID.—SECTION 4½, ARTICLE VI, CONSTITUTION—CONSTRUCTION.—Section 4½ of article VI of the constitution was not intended to mean that the mere fact that the evidence may support the judgment is a sufficient reason in all cases for refusing to set it aside.

(1) 40 Cyc., p. 2510, n. 29.    (2) 16 C. J., p. 586, n. 98; 40 Cyc., p. 2601, n. 37, p. 2622, n. 60, p. 2640, n. 86.    (3) 40 Cyc., p. 2618, n. 30, p. 2620, n. 43.    (4) 40 Cyc., p. 2620, n. 50 New.    (5) 40 Cyc., p. 2608, n. 62.    (6) 17 C. J., p. 369, n. 6, 8; 33 Cyc., p. 1486, n. 12.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial. H. L. Preston, Judge. Reversed.

The facts are stated in the opinion of the court.

A. L. Wessels and Lewis D. Mooney for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendant was convicted of the crime of rape, alleged to have been committed September 22, 1924, and sentenced to imprisonment in the state prison. He has appealed from the judgment of conviction and the order of the court denying his motion for a new trial.

The prosecutrix was born April 6, 1914. In the following November her mother married a man who is not the father of the child. The issue of the marriage is a daughter, born in May, 1915. On the twenty-ninth day of February, 1924, the superior court of Sonoma County granted the wife an interlocutory decree of divorce on the ground of extreme cruelty. She was given the custody of the daughter of the parties during the school months of the year, the father to have her custody during school vacations. Of course, the mother had the natural right to the custody of the prosecutrix. The mother was employed as a teacher in one of the public schools of Sonoma County and after the entry of the interlocutory decree she and her younger daughter resided on a farm adjoining that of her husband. The mother endeavored to induce the prosecutrix to live with her, but the prosecutrix refused and during the months of "March,

6. See 8 Cal. Jur. 602.

April, May and the better part of June," 1924, she lived with her stepfather on his farm. The probation officer then took her to the detention home at Santa Rosa, where she and her sister remained for several weeks. It appears from the evidence that the prosecutrix had more affection for her stepfather than for her mother. The mother was employed as teacher of the public school at Irmulco, Mendocino County, for the term commencing in September, 1924. The prosecutrix objected to going with her mother to Irmulco, and, in the language of the mother's testimony, the stepfather "said I could take" the younger girl, "but should not take" the prosecutrix, "and he held on to" her "hand and resisted my taking them. . . . She held back too and cried, and I finally just picked her up and carried her out to the car and she was kicking the whole time."

The mother and the girls lived together at Irmulco in a house provided for them by the school district. In the early part of August the mother and the defendant met for the first time and about three weeks later they agreed to marry as soon as she was granted a final decree of divorce. The defendant visited the mother frequently and their engagement was discussed with the children, who were requested by the mother to call him "daddy." The younger girl complied with this request, but the prosecutrix testified that she did not, that she never liked the defendant, and frequently asked her mother not to marry him, but to go back to the stepfather. September 21st the mother went to Ukiah to attend a three-day session of the county teachers' institute, commencing on the 22d. She left the two girls in her home at Irmulco in charge of defendant, no other persons being with them. During the mother's absence the girls and the defendant slept together in the same bed, the latter sleeping in the middle. The prosecutrix testified that while the three of them were in bed together the defendant had sexual intercourse with her twice during the night of September 22d and once during the night of the 23d; that she tried to get away from him, but that he held her so that she could not; that she did not make any noise or outcry and did not know whether her sister was awake or not; that the defendant did not ask her not to tell what he had done and that she had said nothing about the matter to any person until the latter part of December, 1924. The

defendant admitted that he slept with the girls, but denied that he committed the act charged. The children at no time made any complaint to the mother of any improper conduct on the part of the defendant during her absence and he continued to visit her and to associate with the children as he had been accustomed to do. During the mother's absence at institute the prosecutrix wrote the stepfather that her mother had agreed to marry the defendant.

On the twenty-sixth day of December the mother took the children to Willits and gave them into the custody of the stepfather, who took them to Santa Rosa. The prosecutrix testified that a few days later she told her stepfather that the defendant had committed the alleged offense; that she had not previously told any person of the offense; that she "was not going to tell anybody," that she did not tell her mother because "I was afraid she would whip me." On the thirty-first day of December the prosecutrix was examined by a physician and surgeon of ten-years' experience, a graduate of Cooper Medical College. This physician testified that she made a careful examination of the sexual organs of the prosecutrix and found that the hymen "had been ruptured decidedly. . . . The hymen itself was entirely gone. Only the remnants of the hymen remained. . . . It was not done within a few days." The children were thereafter taken to Ukiah and placed in the county hospital, under the charge of the officers thereof, where they were kept until the time of the trial. While the children were at the county hospital, at the request of the mother and of counsel for the defendant, the county physician of Mendocino County, a graduate of Cooper Medical College, who had been engaged in practice continuously since the year 1896, examined the sexual organs of the prosecutrix. He testified: "I found the hymen intact. It hadn't been ruptured. I examined her very carefully." A nurse at the county hospital, basing her statement upon an acquaintance of two months while the girl was at the hospital, testified that the reputation of the prosecutrix for truth and veracity was bad.

It was the theory of the defense, as announced at the trial, that both the stepfather and the prosecutrix were desirous of preventing the contemplated marriage of the mother and the defendant; that the stepfather exercised an undue influence over the girl, and that, when she informed

him that the defendant had slept with the children during the mother's absence, the stepfather induced the prosecutrix to say and testify falsely that the defendant committed the alleged crime. The prosecutrix testified on cross-examination in part as follows: "Q. Is it not a fact that the only thing you told him (the stepfather) was that your mamma had left you children with Mr. Adams and that Mr. Adams had slept with you children, is that not right? A. That's the way . . . (my sister) told him but I told him a little more. Q. What did you tell him? A. I told him he put me on top of him and put his finger in me. Q. That's all you told him? A. Yes. . . . Q. What did you do then? A. Well, my aunt took me for a walk and I told her about it. . . . Q. How long did you stay down there after you told him that? A. A month or three weeks. Q. Did you ever—when you found this out, did you ever write and tell your mamma about it? A. No. Q. You were writing to mamma all of the time while you were in Santa Rosa? A. Yes. Q. And never wrote and told her anything about this? A. No. . . . Q. . . . He (the stepfather) told you what to say when you got on the witness-stand, didn't he? A. No. . . . Q. . . . (He) has been out to the county hospital on a number of occasions since you have been out there? A. Yes. Q. And you have sat on his lap most of the time? A. Yes. Q. And you liked him pretty well. A. Yes. Q. And you were sitting on his lap out here in the district attorney's office yesterday? A. Yes. Q. And he was kissing you and hugging you out there? A. Yes. Q. You have been pretty good friends? A. Yes. Q. And you know that he is not your father? A. Yes. But you always do what he says, what he tells you to do? A. Yes. Q. Always been a good little girl that way? A. Yes. Q. And you were pretty mad because your mamma was going to marry Mr. Adams? A. No. Q. Why did you not write to . . . (your stepfather) and tell him about that? A. I wanted him to know it. Q. . . . Did you ever tell your mamma about this? A. No. Q. You have seen your mamma a number of times since this matter came up? A. Yes. Q. Why didn't you tell her about it? A. Well, because I was told not to talk about it. Q. Who told you that? A. Mr. Hurley. . . . Q. Now, did anybody else except the district attorney tell you not to talk to your mamma about

these things? A. I don't think so. . . . Q. You have seen your mamma several times since being at the county farm, haven't you? A. Yes. Q. And never told her anything about this? A. She talked to me about it but I didn't say anything.'' The foregoing outline of the evidence is not intended, of course, as an intimation that any witness testified falsely or that the weight of the evidence is on the one side or the other, but to show that the errors hereinafter considered have resulted in a miscarriage of justice.

The defendant was thirty-three years of age at the time of the alleged offense. He had been convicted of the crime of forgery in the state of Washington and, as punishment therefor, had there served a term of three years in the state prison. He testified that his occupation was that of woodsman and he was engaged in that occupation during the year 1904 and up to the time of his arrest in January, 1925. His occupation was not otherwise shown. He was cross-examined in part as follows: "Q. How old are you? A. Thirty-three. Q. And where were you born? A. Modesto, California. Q. What year? A. 1892—the 11th day of January. Q. Where were you during the year 1905? Mr. Wessels: Object to that as incompetent, irrelevant and immaterial. The Court: This is cross-examination. Objection overruled. Go ahead. A. In 1905 I was in the State Industrial School at Whittier, California. Q. Reform School? Mr. Wessels: The only ground for impeachment the district attorney can ask here is whether he has been convicted of a felony. . . . I therefore object to the question as being incompetent, irrelevant and immaterial and no foundation laid and ask that the answer be stricken. Mr. Hurley: It is not for the purpose of impeachment at all. The Court: Objection overruled. Mr. Hurley: At the Whittier Industrial School in California? A. Yes, sir. Q. How many periods of time did you spend at the Whittier Reform School? Mr. Wessels: Same objection—incompetent, irrelevant and immaterial. The Court: Same ruling. Mr. Hurley: You got out of there once and went back again as an incorrigible, didn't you? Mr. Wessels: Same objection. The Court: Same ruling. A. Yes. Mr. Hurley: You say your name is Thomas Hudson Adams? A. Yes. Q. Did you ever use any other name? Mr. Wessels: Object, incompetent, irrelevant and immaterial. The Court: Objection

overruled. A. Yes, sir. Mr. Hurley: You state in your direct examination that your occupation is that of a woodsman? A. Yes. Q. Have you followed other occupations, businesses or professions besides the one you have given here? A. Not outside of the reform school and the penitentiary in Washington. Q. Ever prizefight any? A. I have boxed some. Q. Did you ever fight any before the public? Mr. Wessels: Object as incompetent, irrelevant and immaterial. It is no discredit to a man to be a prizefighter and does not go to the credibility of the witness. Mr. Hurley: He testified as to his occupation. The Court: Go ahead. Objection overruled. A. I have boxed some in smokers. Mr. Hurley: My question is whether you have boxed before the public? A. Yes, sir.''

No reason appears for the introduction of the foregoing evidence except to prove the defendant's general bad character or to impeach him as a witness. [1] The defendant made no attempt to prove that he was of good character in respect to the traits involved in the charge and, therefore, it was not allowable for the prosecution to prove his bad character, even if the evidence produced had related to such traits, it having no tendency to show the relations between the defendant and the prosecutrix. (*People* v. *Cook,* 148 Cal. 334, 340 [83 Pac. 43].) [2] It is well settled that the guilt of a defendant on trial for an alleged crime cannot be established by proof of general bad character or of other crimes or wrongful acts which have no relevancy to the crime charged, nor may a witness be impeached ''by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony.'' (Code Civ. Proc., sec. 2051.) This statutory rule is so clear and certain that it is deemed unnecessary to cite any of the numerous cases holding that the statute means precisely what is stated therein.

[3] Relative to the use by defendant of an assumed name and to the fact that he had engaged in boxing contests, the language of the supreme court in *People* v. *Fleming,* 166 Cal. 357, 381 [Ann. Cas. 1915B, 881, 136 Pac. 291], where similar errors were under consideration, is particularly applicable. It is there said: ''There was no dispute whatever as to the true name of defendant, and

obviously the sole purpose of seeking such proof was to reflect discreditably on the defendant by showing that he went under an assumed name, a thing, as said by this court, 'not conducive to a good character for defendant.' (*People* v. *Arlington,* 123 Cal. 357 [55 Pac. 1003].) . . . People look at things differently, and we would indeed be ignorant as to existing conditions if we did not know that some people do not look with favor upon a man who engages in what they consider 'prizefighting,' even though the same be by amateurs as distinguished from professionals, and under the auspices of a club. . . . Obviously learned counsel for the prosecution did not think it would improve the standing of defendant with the jury to be known as a participant in such contests." In *People* v. *Frank,* 71 Cal. App. 575 [236 Pac. 189], it was held to be prejudicial error to admit proof that the defendant had used an assumed name. (See, also, *People* v. *Williams,* 72 Cal. App. 52 [236 Pac. 355]; *People* v. *Mohr,* 157 Cal. 732 [109 Pac. 476]; *People* v. *Denby,* 108 Cal. 54 [40 Pac. 1051]; *People* v. *Waller,* 64 Cal. App. 390 [222 Pac. 171].) **[4]** It was clearly error to admit proof of the defendant's commitment to the reform school and of his return thereto for incorrigibility. In *People* v. *Wyett,* 49 Cal. App. 289 [193 Pac. 153], the defendant was charged with the infamous crime against nature. Evidence was admitted relating to the commission of a similar offense by the defendant against a person other than the prosecuting witness. It was held that the error of admitting such evidence required a reversal of the judgment and that section 4½ of article VI of the constitution had no application to the case.

The testimony of the prosecutrix and that of the defendant as to the commission of the alleged crime are in direct conflict. There is no other direct evidence upon the question. Defendant's credibility as a witness, therefore was of the highest importance to him. **[5]** He was properly impeached by proof that he had committed a felony. Notwithstanding such proof, however, the jury might have believed him as a witness. But when, in addition thereto, it was shown that he had been committed to the reform school when thirteen years old, that he was later returned thereto because he was incorrigible, that he had used an assumed name, and that he was a prizefighter, it

is probable that the jury concluded that he had become so hardened and confirmed in wrongdoing as to be wholly unworthy of belief and so devoid of moral character that he would not hesitate to commit the atrocious crime with which he is charged. If it be said that such proof ought to be permitted in a case of this character, it is a sufficient answer that the law forbids it.

The evidence is sufficient to support the judgment. [6] It is perfectly clear, however, that section 4½ of article VI of the constitution was not intended to mean that the mere fact that the evidence may support the judgment is a sufficient reason in all cases for refusing to set it aside. To give the section that meaning would often lead to gross miscarriages of justice, as where evidence vital to the case of a party is rejected or evidence vitally damaging to his case is erroneously admitted, or where the court erroneously instructs or refuses to instruct the jury as to the law applicable to an essential issue. The courts have not attempted to frame a definition of "miscarriage of justice" which can be applied to the varying circumstances of the many cases where the constitutional provision is invoked, and obviously it would be impossible to do so. (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, 555 [147 Pac. 238].) The quotations which follow, however, taken from cases in which the question has arisen, are elucidating. "The central or all-important purpose of said constitutional provision is, obviously, to legally justify the courts in refusing to interfere with or disturb verdicts of guilty in criminal cases in the trial of which error has been committed and in which the evidence amply supports such verdicts, when such interference may justly be withheld consistently with a just and proper regard for the substantial rights of persons tried for public offenses." (*People* v. *Tomsky,* 20 Cal. App. 672, 683 [130 Pac. 184].) "We do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering 'justice' in criminal cases, . . . we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt

or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (*People* v. *O'Bryan,* 165 Cal. 55, 65 [130 Pac. 1042].) "The phrase 'miscarriage of justice' does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied." (*People* v. *Wilson,* 23 Cal. App. 513, 524 [138 Pac. 971].) "We are unable to determine whether the defendant would or would not have been convicted by the jury had this erroneously admitted testimony been withdrawn from their consideration. This being so, we do not feel that section 4½ of article VI of the constitution can be given application to uphold the judgment." (*People* v. *MacPhee,* 26 Cal. App. 218, 226 [146 Pac. 522].) "It is readily conceivable that the exclusion of respondent's statements . . . might have been directly responsible for the verdict. This being so, we are of the opinion that the error resulted in a miscarriage of justice." (*Hirshfeld* v. *Dana,* 193 Cal. 142, 150 [223 Pac. 451].) "We cannot even, after a careful review of the evidence, say that the jury, under proper instructions, would probably have reached a conclusion in favor of the plaintiffs. Under these circumstances, we would not be justified . . . in disregarding the error." (*Langford* v. *San Diego Elec. Ry.,* 174 Cal. 729, 734 [164 Pac. 398].) "Nor is it a matter for consideration . . . that another jury upon a new trial might upon such conflicting evidence and proper instructions render a verdict of guilty." (*People* v. *Roe,* 189 Cal. 548, 561 [209 Pac. 560]. See, also, *Webster* v. *Orr,* 174 Cal. 426, 428 [163 Pac. 361]; *People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129, 142]; *People* v. *Walker,* 69 Cal. App. 475 [231 Pac. 572, 582]; *People* v. *Irby,* 67 Cal. App. 520, 530 [227 Pac. 920]; *People* v. *Avila,* 50 Cal. App. 228, 231 [194 Pac. 768]; *People* v. *Columbus,* 49 Cal. App. 761, 763 [194 Pac. 288]; *People* v. *Clark,* 28 Cal. App. 670, 674 [153 Pac. 719].)

Appellant contends that the court refused to select and appoint a physician to examine the prosecutrix. Defendant requested such selection and appointment prior to the time

that the county physician testified, but the record shows that the request was withdrawn before such testimony was given. Had the request been renewed after the irreconcilable testimony of the two physicians had been given, it is probable that the court, in the interest of justice, and with the mother's consent, would have selected a physician to make the examination. The other grounds urged for a reversal are without merit.

The judgment and the order are reversed.

Hart, J., and Plummer, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 11, 1926.