[Crim. No. 3223.   Second Appellate District, Division One.—December 29, 1939.]

THE PEOPLE, Respondent, v. CARLO CURTIS, Appellant.

William J. Clark, Harvey D. Taylor and Isador Gralla for Appellant.

Earl Warren, Attorney-General, D. S. McLaughlin, Deputy Attorney-General, Buron Fitts, District Attorney, and Jere J. Sullivan and Percy Hammon, Deputies District Attorney, for Respondent.

WHITE, J.—Defendant appeals from a judgment of conviction upon an indictment charging him with perjury and from an order denying him a new trial. The perjury is alleged to have been committed by him in the course of his testimony given before the grand jury of Los Angeles County. Upon his appearance before the grand jury and prior to any interrogation of him other than to ask his name, address and telephone number, defendant was admonished of his rights in the following language:

"Mr. Curtis, you understand you are not required to testify; you can claim exemption from testifying and refuse to testify on the ground that it might tend to incriminate you; and you understand anything you say can be used against you. Do you understand those rights? A. Yes, sir. Q. And notwithstanding those rights, are you willing to make a statement here? A. Yes, sir."

Following his expressed willingness to testify, defendant was asked this question: "You understand that the grand jury at this time is investigating in general the political corruption in Los Angeles, possible grand theft, possible alterations of public records and possible violation of election laws or conspiracy to violate some of those statutes. You understand that, do you?" To which he gave the answer, "Yes, sir."

Epitomizing the testimony given by the defendant before the grand jury, so far as the same is germane to the issues now before us, the record indicates that he testified that he was acquainted with one Patrick J. Currey, a member of the Los Angeles police department; denied that he had a conversation with Currey about taking a promotional examination for sergeant in said police department; denied telling Currey that he could make him a sergeant in the police department or that he ever talked to Currey about the latter's paying the defendant any money to help the former get a promotion in the police department. This was followed by a categorical denial that Currey ever paid the defendant any money and a denial that defendant ever talked with anybody about helping them in examinations for promotion in the police department. Defendant denied ever receiving any money from anybody on the understanding that he would help them in their examinations for promotion in the police department, or that he ever talked with anybody about helping them, either about promotion in the police department or securing an appointment thereto. While under oath, defendant specifically denied that he ever told Officer Currey that he would be "in the money" on any promotional examination for sergeant; or that he had ever told Currey that he, the defendant, had "made a man by the name of Riley a sergeant in the police department"; admitted knowing Riley in 1935; denied knowledge of the fact that Riley took a promotional examination for sergeant in the police department or that he ever talked with Sergeant Riley about such promotional examination. Defendant denied ever telling Sergeant Riley that he "could help put him over in the examination for police sergeant for $100. He denied ever giving Sergeant Riley a list of questions and answers for a civil service examination in the police department or ever giving a list of such questions and answers to any one. He specifically denied

ever giving anybody any list purporting to be questions or answers in any civil service examination in the city of Los Angeles.

Defendant admitted knowing one Earl H. Wilson, but denied knowing whether Wilson had taken an examination for the position of police officer or that he had ever talked to Wilson about the latter's taking such an examination. He denied ever telling Wilson that he could help him on a police examination and that it would cost Wilson $500; denied ever giving Wilson any questions or answers for any civil service examination or that Wilson ever paid him any money. He denied advising Wilson that he would be number 17 on the list on an examination in the police department, or that he knew that Wilson passed number 17 on the civil service eligible list.

Defendant admitted knowing one O'Neill Ganey, but denied ever giving the latter any list of questions and answers in connection with civil service examinations for the police department.

Defendant specifically denied ever giving anybody a list of numbers purporting to be a key to the answers in a civil service examination in the city of Los Angeles or that he ever gave any person a list of numbers purporting to be questions which were to be answered by marking the same "true" or "false" in any civil service examination.

In proof of the alleged perjury, the prosecution at the trial introduced testimony of Patrick J. Currey that he met defendant in April, 1938, following a conversation he had with another person who suggested that Currey go to the office of defendant; that upon introducing himself to defendant the latter advised him that he wished he had known him before the last detective examination; that he had aided four men on the last detective lieutenant examination and would see that Patrick J. Currey was taken care of on the sergeant's examination; whereupon Currey gave defendant $50. Currey further testified that defendant thereupon said, "You don't have to take my word for it that I can put you over on the sergeant's examination; you can call up these four men whom I have made;" at the same time giving four names to Currey; but at the trial Currey was unable to remember any of the names except the name of Sergeant Riley. The witness testified

that he borrowed the $50 from the Los Angeles Police Federal Credit Union; that about a week later he met the defendant and conversed with him concerning the examination, defendant telling Currey that he would be taken care of on the sergeants' examination; that he, the defendant, had been over to see one Cormack and that the latter was a civil service commissioner at that time. The witness, Currey, further testified that the defendant advised him he would have to have an additional $250; that about June 6th or 7th the witness was working as a police officer at the intersection of Santa Barbara and Figueroa when defendant came out to see him; that both rode around the block, defendant stating to Currey that he would have to have $250 and that he would have to have it soon; that the witness advised defendant he would raise the money that day and invited appellant to return on Wednesday, the 8th of June. Currey further testified that in the *interim* he secured $250 from the Los Angeles Police Federal Credit Union which he gave to defendant as agreed on June 8th.

The witness Currey further testified that when the results of the civil service examination were announced he did not make a passing grade, and that upon advising appellant thereof the latter stated, "They can juggle them grades up and down any way they want. You will be taken care of." The witness further testified that following his unsuccessful attempt to pass the examination appellant promised to return his money, but never repaid the same.

That the witness Currey borrowed the money as aforesaid was corroborated by the testimony of his wife that she signed an application for a loan and later saw her husband with $250 in his possession. Further corroborating the witness Patrick J. Currey was the testimony of his uncle, a captain of police, who testified that he had known appellant for about 20 years; that during the month of March or April, 1938, he had a conversation with defendant on Spring Street in the city of Los Angeles, at which time defendant advised Captain Currey that "he was strong with the city administration, that is, the Shaw administration, and he might be able to do me some good. I told him there wasn't anything I wanted, but I had a friend that he might help, and he said he could do that. He said it was merely for friendship, and later I met him and he said he

would take $50''. Subsequently thereto Captain Currey again met the defendant, who said "it was getting pretty tough and he would need some more money. I do not remember the exact amount, but somewhere around $200. . . . We were discussing civil service examinations. . . . He said he was pretty strong up there and he could do a lot of good to helping anybody get higher on the list.'' Captain Currey further testified that following announcement of the results of the examination and the failure of his nephew to make a passing grade, defendant stated to him that "he was doublecrossed, and he did not know just exactly how it all happened, but he said that the boy would get the money back, he was going to refund it''.

H. S. Eaton, a police officer of the city of Los Angeles and vice-president of the Police Relief Association and treasurer of the Los Angeles Police Federal Credit Union, testified that on or about April 21st a loan of $50 was made to Patrick J. Currey by the credit union and on June 7, 1938, a further loan in the amount of $250 was likewise made.

Sergeant Edward J. Riley testified that he was acquainted with defendant for many years; that defendant visited Riley's home at Thirty-eighth and Western Avenue, and later while Riley was living in West Los Angeles defendant came to his home four or five times, and that Riley had been to defendant's home two or three times, the first of which visits occurred in 1935. The witness further testified that he took a promotional examination in the police department about June 29, 1935, for the position of sergeant; that before he took the examination he saw the defendant on four different occasions in relation to the examination. Sergeant Riley further testified that defendant approached him to borrow $100, which Riley loaned him; that subsequent to this transaction and on or about June 26th, after Riley had made application to take the promotional examination, defendant came to the former's home and gave some papers to Riley, telling the latter to study them over, that it might do him some good; that the papers in question contained a list of questions and answers marked "true" and "false". Riley testified that he took the questions, read them over several times, and on the morning before the examination returned them to defendant. He testified fur-

ther that as near as he could recall approximately fifty per cent of the questions the defendant gave him were used in the examination. Riley further testified that some time in October, 1935, defendant came to his home and told him he thought he could get him a high oral rating in the examination because he had a friend in the city administration, but it would cost about $125 to $150.

Earl Howard Wilson, an assistant in a service station, testified that he was acquainted with defendant about 10 years; that he took three different police entry examinations, the last one about March, 1936, and that about that time and prior to taking the examination he had a conversation with defendant wherein the latter advised Wilson he could be of some material assistance. Upon invitation, Wilson went to defendant's office, where the defendant told him he could get him a high place on the list for about $500, and that when Wilson advised defendant he did not have that much money he was told that some arrangements might be made with reference to terms. Thereafter, Wilson testified, he saw defendant again, advising the latter that arrangements would be made to pay the required money on time payments, after which Wilson went to defendant's office, where he was given a list of questions which he was permitted to study. Wilson further testified that these questions had to do with police work and were identical with the questions on the examination sheet, with the exception of a couple of questions that were missing from the sheet that Wilson had. Wilson further testified that on March 25, 1936, he paid defendant $140, an additional $100 on June 18th, and in all paid defendant approximately $365. Wilson further testified that he obtained information from the civil service department showing that he was number 17 on the list, and that defendant had advised him two weeks before he was notified of his rating that he would be number 17 on the list.

Various records of the civil service commission of the city of Los Angeles were introduced in evidence, showing the examinations taken by Sergeant Riley and the witnesses Wilson and Patrick J. Currey. In connection with the record of the examination of the witness Wilson, who obtained a general average of 95.2, it is apparent to the naked eye that a grade in column 2 of the record in which appeared

the oral grades, had been erased, which necessitated an erasure in the general average and also an erasure in the rank of the candidate. The witness who identified these civil service records stated that the changes were made by him under orders of his immediate superiors. The erasures and changes placed Wilson in a higher position or rank on the eligible list.

For his first ground of appeal appellant asserts that the indictment does not state facts sufficient to constitute a public offense. In support of this claim it is contended that the indictment alleges that the grand jury was and had been for some time engaged in an inquiry concerning violations of section 54b of the Penal Code, conspiracies to violate said section, alleged grand thefts and extortions, alleged violations of sections 113 and 114 of the Penal Code, and also alleged conspiracies to violate said sections, as well as ''alleged receipt of bribes, bribery of executive and ministerial officers of the City of Los Angeles'' and conspiracies to violate section 68 of the Penal Code. By reason of the foregoing appellant. contends that there were embraced within the grand jury investigation referred to in the indictment three species of conspiracy, three distinct species of larceny, and the violation of four specific statutory provisions, one of which embraced several subdivisions. This, says appellant, renders it apparent that from the broad scope of the investigation there might come many charges, and that it is not alleged that the charges under investigation concerned only acts committed in Los Angeles County which the grand jury was authorized to investigate. It is further urged that the indictment is defective in that it does not contain an averment that the session of the grand jury was held in Los Angeles County. The next infirmity charged against the pleading is that it does not allege that the false swearing was wilful. The final challenge to the sufficiency of the indictment takes the form of a claim that the proceedings before the grand jury leave no doubt that it was this appellant himself who was the subject of the grand jury's investigation, and that because appellant was not so informed the constitutional provision against self-incrimination prohibits the administering of an oath to him and that therefore a charge of perjury cannot be found against him.

None of these claims on the part of appellant can be upheld. It is to be remembered that the sufficiency of the indictment is not to be tested by the rigorous rules of the common law, nor by the rules existent in this state prior to the 1927 and 1929 amendments to our statutes governing pleadings in criminal cases. Section 966 of the Penal Code has to do solely with the sufficiency of pleadings in perjury and subornation of perjury cases. By the terms thereof an indictment or information charging perjury is declared sufficient when it sets forth the substance of the controversy or matter in respect to which the offense was committed and before whom the oath alleged to be false was taken; that the person before whom it was taken had authority to administer it; with proper allegations of the falsity of the matter on which the perjury is assigned. Measured by the rules thus announced, the indictment before us is amply sufficient. ■ But further answer may be made to appellant's claims by the statement that the purpose of an indictment or information is simply to inform the accused of the charge which he must meet at the trial. (Sec. 952, Pen. Code.) As was said in *People* v. *Beesly,* 119 Cal. App. 82 [6 Pac. (2d) 114, 970]: "There, in a nutshell, is stated the principle of our present simplified form of pleading a criminal offense—the accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, . . . " Where this information came solely from the indictment, as at common law, more particularity was required, but under our system, the law now provides, as part of the accusatory procedure, that in every criminal case the accused is entitled to a transcript of the testimony given before the grand jury or the committing magistrate, as the case may be. (Secs. 870, 925, Pen. Code. See, also, *People* v. *Gilbert,* 26 Cal. App. (2d) 1 [78 Pac. (2d) 770]; *People* v. *Yant,* 26 Cal. App. (2d) 725 [80 Pac. (2d) 506].) By reference to the grand jury transcript appellant would be apprised of the fact that all of the offenses under investigation in the instant case were committed in the county of Los Angeles. ■ However, the grand jury is not confined to the investigation of crimes committed wholly within the county of Los Angeles. That body is clothed with power to inquire into all public offenses committed or *triable* within the county (sec. 915, Pen. Code); while sections 778, 778a, 778b, 781, 782, et seq., enumerate

offenses that may be committed out of the county or partly within the county and *triable* within this county. ■ Appellant is in error when he asserts that the indictment does not in express terms allege that the session of the grand jury at which he testified was held in Los Angeles County, because the pleading in question directly alleges " . . . that on or about the 10th day of November, 1938, in the County of Los Angeles, State of California, the Grand Jury of the County of Los Angeles was then and there engaged in . . . an inquisition and investigation . . . "; and the transcript of his testimony before the grand jury advised appellant that he was sworn and testified in room 548 on the fifth floor of the hall of justice in the county of Los Angeles. ■ Appellant's claim that the failure of the indictment to allege that the false swearing was wilful renders it defective is equally without merit. At the trial the jury was fully instructed that unless the defendant gave his testimony knowingly, *wilfully*, intentionally and with intent to deceive the grand jury, he was entitled to an acquittal, and the jury was further admonished that ignorance of the true facts, inadvertence or mistake, are not substitutes for wilfulness or intent. Furthermore, the trial proceeded as if the allegation of wilfulness were present in the indictment. The omission to directly charge in the indictment that the appellant testified falsely in a wilful manner had no effect upon the trial, nor did such omission impair or prejudice any of appellant's substantial rights. We fail to perceive where the inclusion of the charge of wilfulness would have affected in the slightest degree the course which the trial took or would have changed the verdict of the jury or the judgment of the court. (*People* v. *Settles*, 29 Cal. App. (2d) (Supp.) 781, 784 [78 Pac. (2d) 274]; *People* v. *Bonfanti*, 40 Cal. App. 614, 616 [181 Pac. 80]; *People* v. *Hinshaw*, 194 Cal. 1, 23 [227 Pac. 156]; *People* v. *Kuder*, 93 Cal. App. 42, 55 [269 Pac. 198, 630]; *People* v. *Beesly*, *supra*.)

■ Appellant's contention that a charge of perjury could not be found against him because the proceedings before the grand jury make it manifest that he himself was the subject of the inquisitorial body's investigation, is also untenable. The nature of the grand jury's inquiry was clearly and understandingly explained to appellant, as hereinbefore set forth, at the time he appeared as a witness.

Also, appellant was advised at the grand jury session that it was his privilege to refuse to testify on the ground that his testimony might tend to incriminate him. His rights and privileges were fully protected and safeguarded in the grand jury room.

■ Appellant's contention that the indictment does not conform to the provisions of subdivision 2 of section 950 of the Penal Code finds a complete answer in what we have hereinbefore said, coupled with the language used by this court in *People* v. *Gilbert, supra,* at page 8: "While appellants base their demurrer to the indictment upon section 950 of the Penal Code, it is clear that section 950 must be construed in conjunction with sections 951 and 952 in order to determine how and in what manner an indictment must allege and name the charge so that a defendant will be able to properly prepare a defense."

■ It is next contended by appellant that the evidence is insufficient to sustain a conviction for the asserted reasons that "(a) there is no evidence that the testimony alleged to be false was material; (b) there is no corroboration; (c) it was not only necessary to allege the materiality of the testimony charged to be false but it is equally necessary to prove its materiality".

Specifications (a) and (c) may be considered together. Section 923 of the Penal Code provides in part: "The grand jury must inquire . . . into the willful or corrupt misconduct in office of public officers of every description within the county." In the instant case, when appellant appeared to testify before the grand jury he was advised as follows: "You understand that the grand jury at this time is investigating in general the political corruption in Los Angeles, possible grand theft, possible alteration of public records, and possible violation of election laws or conspiracy to violate some of those statutes. You understand that do you?" To which the appellant responded, "Yes, sir."

■ It is established in our law that it is for the judge presiding at the perjury trial to determine the materiality of the allegedly perjured testimony. The question of the materiality of evidence, whenever or however it arises, is always one for the court. Whenever the question of the materiality of evidence arises during the ordinary trial of a cause when one party offers evidence and its materiality

is put in issue by appropriate objection, it is concededly a question of law for the court. The same is true when the question of the materiality of the charged false testimony arises in a trial for perjury. The duty of the jury is to find the facts and apply to them the law as expounded by the court. (*People* v. *Lem You,* 97 Cal. 224 [32 Pac. 11].) To us it seems irrefutable that when the grand jury was investigating alleged corruption and misconduct of public officers it was essential and material for that body to know from appellant when he appeared before it as a witness whether he had solicited money with which to influence public officials in the discharge of their duties in connection with grading the civil service examination papers of applicants for positions as police officers in the city of Los Angeles. It was certainly material to the inquisition for the grand jury to know whether appellant in advance of the holding of civil service examinations had been furnished with a list of the questions to be propounded at such examinations and the correct answers thereto. The court's instructions to the jury that appellant's answers to these and other questions propounded to him in the grand jury room were material to the proceedings, charges, matters and things then pending before and under investigation by the grand jury, were correct and proper.

■■■ Answering specification (b), it is sufficient to say that a reading of the evidence hereinabove narrated in this opinion clearly shows that the testimony of officer Patrick J. Currey was amply corroborated by the testimony of his uncle, Gregory Currey. It would unduly prolong this opinion to here set forth the corroborative testimony which appears in the record of the evidence given by the witnesses Wilson and Riley, because it is the law that where the alleged perjured testimony was given before the grand jury, even though the defendant be accused of testifying falsely as to several matters, nevertheless, if the evidence sustains one or more of the assignments of perjury, it is not necessary for the prosecution to prove all of the assignments of perjury. (*People* v. *Follette,* 74 Cal. App. 178, 190, 191 [240 Pac. 502].) The testimony of Gregory Currey in corroboration of that given by the witness Patrick J. Currey clearly meets the test prescribed by section 1103a of the Penal Code. (*People* v. *Casanova,* 54 Cal. App. 439 [202

Pac. 45]; *People* v. *Todd,* 9 Cal. App. (2d) 237, 241 [49 Pac. (2d) 611]; *People* v. *Follette, supra.*)

■ We find no merit in the claim of appellant that the grand jury was without jurisdiction to investigate crimes which appear affirmatively to have been barred by the statute of limitations, for the reason that the grand jury is empowered to inquire into the commission of an offense apparently outlawed by the statute of limitations when it appears, as in the instant case, that answers to such questions may lead to the discovery of similar crimes as to which prosecution would not be barred by the statute. (*State* v. *Kasherman,* 177 Minn. 200 [224 N. W. 838].)

■ It is next contended by appellant that the court misdirected the jury in matters of law. It is true, as urged by appellant, that the court did instruct the jury that the question of the materiality of the testimony appellant was charged with giving before the grand jury was a question of law to be determined by the court, which instruction, as hereinbefore pointed out, is a correct statement of the law; and it is also true that in another instruction the jury was advised that it lay within their province to determine what testimony was material. However, this last-mentioned and erroneous instruction was given at the request of appellant himself; and it is well settled that an appellant cannot question or complain of instructions given at his own request. As was said in *People* v. *Bradbury,* 155 Cal. 808, 815 [103 Pac. 215].

"Appellant argues that by reason of the conflict in instructions, whereby in one the jury is told it must determine the materiality of the evidence; while in the other it is told that such materiality is always a question of law for the court to decide, should work a reversal of the case. But this conflict could not have been injurious to the defendant and must have made for his benefit; for, if the jury were led to the erroneous belief that they could decide upon the materiality of the evidence and had decided that it was not material, the defendant would have obtained an acquittal to which he was not entitled. The fact that under such an erroneous instruction the jury has decided the question of the materiality correctly, as here it did, furnishes no ground for reversal."

■

Appellant challenges the correctness of several other instructions, but when we remember that instructions should not be considered singly, but in their entirety. (*People* v. *Macken*, 32 Cal. App. (2d) 31 [89 Pac. (2d) 173]), we have no hesitancy in saying, from a reading of all the instructions, that the jury was clearly, understandingly and unerringly admonished, and must have understood, that before they could find the defendant guilty they must be convinced beyond a reasonable doubt that he knowingly, wilfully, and in violation of his oath testified falsely as to certain matters material to the grand jury's inquisition; that they must base such conviction upon the testimony of two witnesses or of one witness and corroborating circumstances; and must be convinced beyond a reasonable doubt that at the time of the giving of such testimony he knew the same to be false and that he gave such testimony wilfully and for the purpose and with the intent of deceiving and misleading the grand jury. A reading of all the instructions given impresses us that the trial judge fully and fairly advised the jury as to the kind, quality and degree of proof necessary before appellant could be convicted of perjury. This is all the law requires. (*People* v. *Kelly*, 70 Cal. App. 519, 524 [234 Pac. 110]; *People* v. *Alston*, 139 Cal. App. 575, 576 [34 Pac. (2d) 759]; *People* v. *Bolton*, 215 Cal. 12, 22 [8 Pac. (2d) 116]; *People* v. *Jordan*, 24 Cal. App. (2d) 39 [74 Pac. (2d) 519].)

Appellant next directs our attention to the action of the trial court, over his objection, in permitting the deputy district attorney during the direct examination of the witness Patrick J. Currey to read to the witness from a transcript of testimony given by him before the grand jury. The witness was being interrogated concerning a conversation had with the defendant in the latter's office. After the witness had detailed the conversation and concluded with the statement, "That is all," the deputy district attorney, for the purpose of refreshing the memory of the witness, and over objection, was permitted to read the following questions and answers from the testimony of the same witness given before the grand jury:

" 'Now, then, I wish you would tell us what Carlo Curtis said and what you said at the time you brought the $50 down to him? A. Carlo Curtis told me that as a favor to my friend he was going to see I was made a sergeant. He said

he would have to have $50 and he said he would handle Cormack. That was a civil service commissioner.' Now, do you recall that?'' To which the witness responded, ''I do.'' The deputy district attorney then asked, ''Now, will you state what was said, if that refreshes your memory?'' To which the witness replied, ''That was about the substance of what was said at that time.''

We perceive no error in the ruling of the court. Undoubtedly the witness would have had the right to read his testimony given before the grand jury for the purpose of refreshing his memory. (Code Civ. Proc., sec. 2047.) If a transcript of testimony given at a preliminary examination may be regarded as a private memorandum, and it was so held in *People* v. *Durrant,* 116 Cal. 179, 213 [48 Pac. 75], then certainly a grand jury transcript may also be so considered. In *People* v. *Durrant, supra,* at page 214, the Supreme Court said: ''When a witness called by a party fails to testify to matters previously within his recollection, or gives evidence in apparent variance with that formerly given, it is not incumbent upon the party producing the witness to wait for the assaults of the cross-examination to expose seeming inconsistencies and discrepancies. While he may not impeach his witness (saving under certain exceptional circumstances), he may with propriety refresh his recollection, to the end that the witness and his present evidence may both be put fairly and in their proper light before the jury.''

Further, even if we eliminate the aforesaid evidence from the record, it remains highly improbable that the jury would have rendered any other verdict than that of guilty. With this evidence out of the case entirely there still remained the testimony of Gregory Currey that appellant told him he was influential with the city administration and might be able to do him some good, and that the latter told appellant he wanted nothing for himself but had a nephew, Patrick J. Currey, whom he would like to help, to which appellant replied that he could and would do that, subsequently advising Gregory Currey that it would require the payment of $50. Also, a comparison of the evidence read to refresh the recollection of the witness with his testimony given on direct examination at the trial shows that the latter was substantially the same as that brought out by the grand jury transcript, and the error, if any, was harmless.

We find no error in the ruling of the court by which certain records of the civil service commission of the city of Los Angeles were admitted in evidence. These documents served to corroborate the testimony of the witnesses Patrick J. Currey, Riley and Wilson. They showed that the examinations in connection with which these witnesses talked with appellant and in regard to which, according to such witnesses, appellant offered to help them, were in fact held at the time and in the manner testified to by such witnesses. For example, upon one of the examinations, as was heretofore pointed out, it was apparent to the naked eye without the aid of a glass that upon such document some number comprising two digits, the first of which was 2, had been erased, and that the figure 17 had been substituted in its place, thereby raising the witness Wilson's position on the civil service list from a place in the 20's to 17th place. It will be remembered that Wilson testified appellant had told him that he could get him a higher place on the list. Furthermore, the witness Patrick J. Currey testified that following the receipt by him of information that he had failed to attain a "passing grade" in his civil service examination, appellant told him that "they could juggle them grades up and down any way they want", and that Currey "would be taken care of". The conceded alteration on the list constituting one of the civil service examinations lends corroboration to Currey's testimony as to what appellant told him could be accomplished in connection with making changes in the positions of civil service applicants upon the list. The evidence was competent, material, relevant and properly admitted.

What we have heretofore said with reference to the sufficiency of the evidence disposes of appellant's next ground of appeal, which is that the court erred in denying his motion to advise the jury to acquit him. The adverse ruling upon the motion was correct.

Finally, appellant earnestly urges that the trial court was guilty of such prejudicial misconduct as to deny him the right of trial by jury as the same is guaranteed by the Constitution and did thereby violate his right to the independent judgment of each individual juror. In this connection, the record discloses that the jury retired for deliberation at 3:15 P. M. Friday, February 17. At 10:15 P. M. of the same day they returned into court, stating that they were un-

able to agree upon a verdict, and were ordered taken to a hotel for the night. At 9 o'clock the following morning, Saturday, February 18th, the jury returned to the jury room for further deliberation. At 10:05 A. M. of that day they returned into court for further instructions, after which they retired for the resumption of deliberations. At 2.30 P. M. the jury returned into court and reported their inability to agree, at which time the foreman advised the court that in his opinion the jury would be unable to reach a verdict. On further inquiry by the trial judge as to whether he could be of assistance to the jury, the foreman suggested that the court instruct the jury concerning "what constitutes corroborating evidence, corroborating circumstances", following which the court expressed its satisfaction with the instructions already given on that point and suggested a rereading of the same by the jury. The court then interrogated several jurors as to their views concerning a possible agreement by the jury upon a verdict, all of whom were of the opinion that a verdict was improbable. Thereupon the following colloquy occurred between the court and the foreman of the jury:

"The Court: I did not ask you, Mr. Olsen, but how did you stand on the last ballot?

"Foreman Olsen: The last ballot was 11 to 1.

"The Court: It has been that way for six ballots at least, hasn't it?"

"Foreman Olsen: Yes, the last six ballots."

After admonishing the jury to again read the instructions, the court directed that they retire for further deliberations, which they did at 2:37 P. M., and at 3:15 P. M. the jury returned into court with a guilty verdict.

Appellant contends that the trial judge was guilty of error in continually interrogating the jury with reference to the possibility of their agreeing upon a verdict after they had expressed their opinion that they were deadlocked. With this contention of appellant we cannot agree, because the weight of authority seems to be that only when the inquiry of the court as to how the jury stands numerically is coupled with the purpose on the part of the court to ascertain how the jury is divided as to the guilt or innocence of the defendant, is the province of the jury invaded and reversible error committed. (*People* v. *Talkington,* 8 Cal. App. (2d)

75 [47 Pac. (2d) 368], and cases therein discussed.) Where, as in the instant case, the court by inquiry sought to ascertain how the jurors were numerically divided, there is no error, and certainly no reversible error. As was said in *People* v. *Von Badenthal,* 8 Cal. App. (2d) 404, 410 [48 Pac. (2d) 82] : "Such information by itself" (referring to inquiry by the court as to the numerical division of the jury) "is proper as a means of assisting the court in its determination as to whether there is a reasonable probability of the jury agreeing upon a verdict and the advisability of sending them out for further deliberation."

However, that portion of the court's inquiry last above quoted, wherein the trial judge, after ascertaining that the jury stood numerically 11 to 1, said, "It has been that way for six ballots at least, hasn't it?" to which the foreman replied, "Yes, the last six ballots," presents an important and serious question. We are in full accord with appellant when he says that if the foregoing establishes the fact or warrants the reasonable inference that there had been some communication between the court and jury outside the presence of the defendant and his counsel, by which means the court obtained information that the jury had stood 11 to 1 for the preceding six ballots, then the rights guaranteed one accused of crime were violated, and a conviction obtained under such circumstances should be set aside. The law zealously guards the right of its citizens to a fair and impartial trial and is vitally concerned that all proceedings had upon criminal trials shall be in the presence of the accused.

It therefore becomes necessary for us to determine whether the last-quoted language of the trial court justifies the conclusion that the court had in some clandestine manner established communication with the jury which resulted in the court's being advised as to the number of ballots taken by the jury while they were numerically divided 11 to 1. No exception to the now challenged statement of the court was taken at the trial, nor was any inquiry made by appellant's counsel as to how the court knew or purported to know that the jury had stood 11 to 1 for the preceding six successive ballots. We are therefore left to surmise and conjecture as to whether the remark of the trial judge was the figment of his imagination; was a mere guess upon his part; or was prompted by information secretly obtained by him

from the jury. We cannot assume that the trial judge was guilty of such serious misconduct as here charged, in the absence of a showing thereof. The place to make such a showing or at least to attempt to do so was at the trial when the incident occurred. By remaining mute appellant deprives us of any ground or reason upon which to predicate a conclusion that the trial judge surreptitiously obtained information as to what was transpiring in the jury room. This is especially true when, as here, the proof of defendant's guilt is overwhelming and practically demonstrated and when not one word was offered, either by defendant or by any witness called in his behalf, in denial of the truth of the charges made against him by witnesses produced by the prosecution. The remark of the trial court was highly improper and should never have been made, but the same does not, under the facts of this case, authorize a reversal in the absence of an objection or exception to it by appellant at the trial or the making of some effort by him to ascertain from the trial judge the source of information, if any, which prompted the statement. It is manifest that had appellant by timely objection or exception called to the attention of the trial court the remark in question, any prejudicial error arising therefrom might well have been cured. A defendant under such circumstances may not remain silent and raise the question for the first time on appeal. ■■■ With the record in the condition in which we find it, we must look into the effect of the error of the trial court in connection with the disposition of the appeal in the light of the provisions of section 4½ of article VI of our state Constitution, which forbids us to set aside any judgment or grant a new trial unless, after an examination of the entire cause, including the evidence, this court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. The phrase ''miscarriage of justice'', used as descriptive of that condition of a cause, has no hard and fast definition. It seems to us that where the record discloses the commission of errors at the trial the appellate court must first find that upon the record it is seriously doubtful that without such errors the defendant would have been convicted, before a reversal of the judgment is justified. (*People* v. *Adams*, 76 Cal. App. 178, 186 [244 Pac. 106].) As was said in *People* v. *Black*, 73 Cal. App. 13, 38 [238 Pac. 374] : ''It is a law that, when

328

applying the provisions of section 4½ of article VI of the Constitution to an entire cause, we must direct a reversal when we are unable to say 'whether appellant would or would not have been convicted but for the errors of the court'. (*People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129].)'' In the case before us the evidence against appellant was undenied and conclusive of his guilt, and in the light of the record we cannot say that the error complained of was so flagrant that it might have been directly responsible for the verdict of conviction. It must be remembered that in the discussion of which the complained of remark formed a part the court admonished the jury to reread certain instructions. We have read the instructions given, together with the evidence, and have no hesitancy in saying that under the evidence but one verdict could be reached, and that was the one returned by the jury. Such being the case, we are without power to set it aside.

The judgment and the order appealed from are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 26, 1940. Carter, J., voted for a hearing.