[Crim. No. 2199. First Dist., Div. One. Mar. 2, 1942.]

THE PEOPLE, Respondent, v. TOM C. COLLINS, Appellant.

Leo A. Sullivan and William A. Sullivan for Appellant.

Earl Warren, Attorney General, and Dennis Hession, Deputy Attorney General, for Respondent.

KNIGHT, J.—The appellant was charged with the crime of burglary and five previous convictions of felony. He entered a plea of not guilty to the burglary charge, and denied having suffered the previous convictions. During trial two of the latter charges were dismissed, and the jury found him guilty of first degree burglary, and that the charges involving the three remaining previous convictions were true. He was sentenced to imprisonment in the state prison, and this appeal was taken from the judgment and the order denying his motion for a new trial.

It appears from the evidence that about 4 a. m. on July

4, 1940, Bernard Schwalm, a college student residing in Berkeley, was awakened by a noise in his bedroom. He sat up in bed, looked toward the window and saw the figure of a tall, thin man, disappear hurriedly from the room. Schwalm got out of bed, and, barefooted and clad in pajamas, pursued the burglar for several blocks, in and out of backyards, through alleys and along the streets. Shortly after the chase started he caught up with the burglar, who stopped, turned around, and facing Schwalm said, "Stay away . . . or I'll kill you." The burglar then turned and ran. Schwalm pulled a picket from the fence, continued the chase, and when the burglar paused to open a gate Schwalm broke the picket over the burglar's head, but it did not stop him in his flight. About this time a young man named Dean joined Schwalm in the pursuit, and succeeded in overtaking the burglar, whereupon the burglar stopped momentarily, faced Dean, and calling him a vile name displayed a knife in a threatening manner. Dean then left to summon the police, but Schwalm continued the chase. The burglar finally ran into a backyard surrounded by a ten-foot fence, and upon reaching the fence turned around, faced Schwalm, and in a menacing manner raised his arm. Schwalm having meanwhile picked up two milk bottles, hurled them at the burglar. The second bottle struck the burglar on the jaw, felling him to the ground. He lay there for a minute or two, then arose slowly and the chase was on again. After running two or three more blocks the burglar stopped, and as related by Schwalm the following conversation took place: "He said 'Let me alone,' and I said, 'No, not until I find out what you took from me.' He said, 'All I got was your wallet, and it's back there where you knocked me down.' . . . I said I had $12.00 in my wallet and I wanted that, and he said, 'If I give you $12.00 out of my own pocket will you let me go?' And I agreed." Thereupon the burglar laid $12 in currency on the pavement and hastily walked away. Later Schwalm found his empty wallet where the burglar said he had dropped it. It was dawn when the chase started, but Schwalm testified that it was "completely light" before it ended, so that each time the burglar stopped his features were clearly discernible. Subsequently Schwalm examined more than two thousand pictures in the police files and picked the photograph of appellant as being that of the burglar. In December of the same year appellant was apprehended in southern California and returned to

Berkeley, where Schwalm and Dean, at different times and out of the presence of each other, positively identified appellant in a line-up of ten or more persons, as being the burglar. In all respects he fitted the description previously furnished the police by Schwalm and Dean; moreover they again identified him at the trial as being the burglar.

The fact that a burglary was committed was not disputed, but appellant, testifying in his own behalf, claimed he was in Los Angeles at the time of the commission of the crime. However, he was unable to state where he was then living, or name any persons with whom he came in contact, nor did he produce any witness or establish any circumstance to corroborate his asserted alibi. He admitted having served the three prior convictions, and that his true name was Truman Thomas Crowley, the name set forth in the records of said prior convictions. The first was obtained in 1922 in Kansas, the charge being grand larceny "and escape from jail"; the second was for burglary, committed in 1933 in Missouri; and the third was for an attempted burglary, in Kansas in 1936.

Appellant makes no point that the evidence is insufficient to support the jury's verdict, but as grounds of appeal urges misconduct on the part of the prosecuting officer, and that the trial court erred in sustaining an objection to a question propounded to appellant on direct examination. It is our conclusion that no ground for reversal has been established.

The first point arises out of the following situation: By the testimony of a police inspector of the Berkeley Police Department who brought appellant from Glendale where he was arrested to Alameda County for trial, the People sought to prove a series of admissions which it was claimed appellant had made to the police inspector, and one of the questions propounded to the witness by the prosecuting officer was whether appellant stated "what his occupation was." Appellant's counsel objected to the question upon the ground that it was incompetent, irrelevant and immaterial. The objection was overruled, and the witness answered in the affirmative. Thereupon, after fixing the time and place of the conversation and the persons present, the witness was asked: "What did you say and what did he say in regard to what his occupation was?" Appellant's counsel again objected on the same general grounds; the objection was overruled, and the witness replied: "I asked him where he had

been last employed and he told me that he was unable to work, he had been a thief all his life, since 9 years old.'' Appellant's counsel asked that ''that all go out,'' and ''that the jury be instructed to disregard it,'' adding, ''I am going to ask for a mistrial, it couldn't be responsive, it couldn't under any circumstances. The district attorney must have known the answer. It couldn't do anything but prevent the defendant from receiving a fair and impartial trial, it's done deliberately. The Court: Motion granted. The answer may be stricken out.'' Appellant's counsel thereupon asked the court to declare a mistrial, saying he cited ''the remark'' as prejudicial misconduct. Following the denial of the motion for mistrial appellant's counsel stated: ''At this time I am going to ask the Court to admonish the jury they are not to be biased or prejudiced by that statement of the officer and absolutely that they are not to draw any unfavorable inference therefrom. The Court: The jury will be instructed at the proper time to disregard any testimony that has been stricken out.'' Such an instruction was subsequently given in the following words: ''You are hereby further instructed that you are not to consider for any purpose any testimony or evidence which has been struck out by the Court, nor the offer of any evidence which was not admitted by the Court.''

As will be noted from the foregoing, appellant's complaint that he was prevented from receiving a fair trial was based upon the fact that the witness included in his answer a prejudicial statement not responsive to the question propounded to him by the prosecuting attorney. But as will be noted also, on appellant's motion the trial court immediately struck out the entire answer and later instructed the jury that testimony so stricken was not to be considered by the jury for any purpose. In that state of the record it cannot be presumed that the jury disobeyed such instruction.

Regarding the accusation made by appellant's counsel that the prosecuting officer ''must have known'' what the answer of the witness would be, it may be said that where from the record itself, as distinguished from a mere accusation of opposing counsel, it may be definitely determined that a prosecuting officer has deliberately framed a question in such a manner as to make it appear that it is a proper question, but which in truth is designed to elicit an answer which he knows will place before the jury inadmissible evidence, his

conduct in so doing is not only grossly improper, but under some circumstances may demand a reversal. However, the determination of questions of this kind must necessarily, in most cases, be left to the trial court, which, of course, should not hesitate to take appropriate action, even to the extent of granting a new trial, when convinced that such misconduct has prevented a defendant from having a fair trial. Obviously the trial court here did not believe that the accusation so made by appellant's counsel against the prosecuting officer was justified; and the record on appeal fails to disclose anything which would warrant this court in holding, as a matter of law, to the contrary. Moreover, in considering the question of whether the objectionable portion of the answer of the police inspector operated to appellant's prejudice, it must be remembered that according to appellant's own admissions before the jury his criminal career, which included the crimes of larceny and burglary, extended back as far as 1922.

■ With respect to the second point, the record shows that upon taking the witness stand in his own behalf appellant testified that his age was 37, that his height was 6 feet 1 inch, and that he weighed 120 pounds. Shortly afterwards his counsel put this question to him: "I will ask you, Mr. Crowley, if you are suffering from any disease?" Objection was made upon the ground that it was incompetent, irrelevant and immaterial, and the objection was sustained. Thereupon counsel stated that his purpose in asking the question was to show that appellant was "suffering from an advanced stage of tuberculosis," and that "it would be impossible for him in his physical condition to have ever run in the manner described that the man on July 4, 1940, was supposed to have run . . ." Further objection was made that the question called "for hearsay and for his medical conclusions"; and in reply his counsel stated that he was not asking for a conclusion, but was "asking him of his own knowledge, if he is suffering from tuberculosis." The court again sustained the objection, but immediately thereupon, according to the reporter's transcript, the following proceedings took place: "Mr. Sullivan: All right. I will ask you this question. On the 4th day of July, 1940, were you physically able to do any running or anything of that nature? A. No sir. Q. For how long a time have you been in a physical condition where you would be unable to run or take any great exertion? A. For about a period of four or five years. Q. Take your coat off,

if you will. Step down in front of the jury, step down over here, roll up your sleeves, if you will, both of them. (The witness stepped down before the jury.) Now, were you in the same physical condition on July 4, 1940, as you are at the present time? A. Yes sir. Q. Put your coat on. (The witness returned to the stand.) Was your weight approximately the same then as now? The Court: Just a moment. Mr. Sullivan: Q. Your weight as of July, 1940? A. It was just about the same, wouldn't vary one way or the other."

The assignment of error here relied upon is directed against the ruling upon the original question, to wit, whether appellant was "suffering from any disease," and it would seem that in view of the evidence showing the circumstances attending the flight and the pursuit of the burglar from the scene of the crime, and considering the purpose of the question as disclosed by appellant's counsel, the trial court should have permitted appellant to answer it, notwithstanding that, as stated by the prosecuting officer, appellant was not "a doctor." However, it cannot be said that the ruling complained of operated to appellant's prejudice, because as will be seen, the real purpose for which the question was asked was fully accomplished by further interrogation by appellant's counsel, and by having appellant partly disrobe so that the jury could observe his physical condition.

After an examination of the entire record including the evidence it is our conclusion that no ground for reversal has been established, and that the verdict has not resulted in a miscarriage of justice. The judgment is affirmed.

Goodell, J. pro tem., concurred.

PETERS, P. J., concurring.—I concur in the conclusion contained in the majority opinion, but not in the reasons given for that conclusion. The majority opinion holds that the prosecuting officer was not guilty of misconduct in asking the question of the officer concerning the admissions made by defendant to him relating to his occupation. It is held that it does not appear from the record that the prosecutor can be charged with deliberately trying to get inadmissible evidence before the jury. I cannot agree with that construction of the record. The question asked of the officer was, "What did you say and what did he say in regard to what

his occupation was?'' The answer was, ''I asked him where he had last been employed and he told me that he was unable to work, he had been a thief all his life, since 9 years old.'' Obviously, the question called for the entire conversation concerning the occupation of the defendant, and just as obviously the answer was responsive to that question. The reference to the fact that the defendant is supposed to have said that ''he had been a thief all his life, since 9 years old'' clearly is responsive to the question concerning the defendant's occupation. It is also perfectly clear to me, the answer being responsive to the question, that the prosecutor, as a matter of law, is chargeable with knowledge of the answer the witness was going to give. The witness was the prosecution's witness. Under such circumstances, the law is clear that the prosecutor is chargeable, as a matter of law, with knowledge of the responsive answers to questions asked by him.

The attorney general concedes the law to be that the character of a defendant cannot be attacked unless he puts his character into issue by producing character witnesses. That is undoubtedly the law. (*People* v. *Arlington,* 123 Cal. 356 [55 Pac. 1003]; *People* v. *Adams,* 76 Cal. App. 178 [244 Pac. 106]; *People* v. *Wells,* 100 Cal. 459 [34 Pac. 1078]; *People* v. *Wong Loung,* 159 Cal. 520 [114 Pac. 829].) It, therefore, follows that in this case it must be held that the prosecutor deliberately attempted to get the bad character of the defendant before the jury when that issue was not before the court. Such tactics should not be condoned. The defendant is entitled to a fair trial, and cannot be convicted simply because he may be a bad man or may have a bad record. It is the duty of prosecuting officials to protect the rights of the defendant, and certainly they have no lawful right to invade intentionally such rights.

It is my opinion, therefore, that the prosecutor in this case was guilty of deliberate misconduct in asking the question for the purpose of eliciting an improper answer. That was error, but not every error requires a reversal. Here the record shows that the trial judge struck the improper evidence from the record, and instructed the jury not to consider stricken evidence for any purpose. While that will not, in all cases, cure the error, it cannot be held in the present case that after an examination of the entire record ''the error complained of has resulted in a miscarriage of justice'' within the meaning of art. VI, Sec. 4½ of the Constitution. In

the present case the defendant admitted that he had served three prior terms for similar offenses. His criminal career admittedly started in 1922 when he was but eighteen years of age. In view of the fact that the improper evidence was stricken and the jury properly instructed to disregard such evidence, and, in view of the evidence properly in the record, it cannot be said, under the circumstances, that there has been a miscarriage of justice as a result of the error under consideration.